0207

Walter NEAL and Industrial Chemical Company, Inc., Appellants, v. J. Simpson DARBY, L. H. Schwieterman, John Archie Lucas, Donald B. Murray, Marion M. Thomas, and J. F. Martin as members of the Chester County Council, and the County of Chester, Respondents.

(318 S. E. (2d) 18)

Court of Appeals

*Robert O. King,* of *Ogletree, Deakins, Nash, Smoak & Stewart,* Greenville, *for appellants.*

*Paul E. Short, Jr.,* Chester, *for respondents.*

June 22, 1984.

SANDERS, Chief Justice:

Appellants Walter Neal and Industrial Chemical Company, Inc., are engaged in the business of reclaiming used paint and industrial solvents. They challenged the constitutionality of a Chester County ordinance pertaining to the handling and storage of hazardous chemicals. Respondents Chester County and its county council members counterclaimed, alleging the company's landfill site is a public nuisance. Following trial of that counterclaim, Neal and the company appeal the order in which the trial judge (who was assisted by an advisory jury) permanently enjoined further disposal of hazardous chemical waste at the site, finding the landfill constitutes a public nuisance by virtue of its location and manner of operation. We affirm.

Neal is a resident of Rock Hill, South Carolina, and founder

and president of Industrial Chemical Company, Inc. The company has obtained both state and federal permits and contracts with various manufacturers to pick up their waste products and send them through reclamation processes at the company's York County facility. Approximately ninety percent of the waste comes from outside South Carolina. Roughly eighty percent of all waste is returned to manufacturers as a clean, pure product, while the remainder is taken to the company's landfill in Chester County. The company owns 62 acres there, with the landfill presently utilizing 3-4 acres within that area.

A volunteer Lando fireman testified that in June 1978, the department responded to a call reporting a chemical fire at the landfill. When he arrived at the site, some of the over 100 barrels in a 15-foot deep pit were broken open and leaking liquid chemicals into the pit. According to his further testimony, these chemicals were burning and barrels were exploding, rising into the air above the pit. Water would not extinguish the blaze, but the fire was finally subdued when someone from the chemical company brought in a bulldozer and covered the barrels with dirt.

The Chester County Council Chairman testified that following the 1978 fire and complaints from residents in the area, county council inspected the site. At that time, he did not see any uncovered barrels or smell an odor. The Chester County Supervisor visited the site in May 1981, upon receiving further complaints after passage of the county's new hazardous waste ordinance. He testified he saw several hundred uncovered barrels in a pit. The videotape he had made of the site was admitted into evidence and viewed by this court on appeal. The supervisor also testified he did not smell the landfill from the road on the day he was present.

The county called as witnesses numerous residents of the area who lived within one-half to three miles from the landfill. Their testimony generally indicated that a haze and sickening sweet odor emanated from the area of the landfill. This odor could be distinguished from the one associated with a nearby paper mill and had not been present since the site was closed in May 1981, several months before the trial. Although the odor from the landfill was not a continuous one, it was frequently present throughout the year and was es-

pecially severe during periods of dumping at the site. A few of these witnesses testified to watery eyes, coughing, sneezing and upset stomachs resulting from the odor, as well as interference with their ability to use their yards for gardening and recreational purposes. Some had actually followed the smell to the landfill site. Several witnesses also testified they had seen trucks transporting leaking barrels to the landfill. Still others expressed concern over possible contamination of Green Creek which flows directly into the Catawba River. According to testimony of the Director of the Chester Water District, the Catawba River is the main water supply for its customers.

The company also presented some local residents who testified there was no odor from the landfill. Other witnesses for the company testified the only odor in the area was still present the week-end before trial, indicating it came from the nearby paper mill as opposed to the landfill site.

Neal testified that the chemicals in question are hazardous but have the consistency of peanut butter, not liquids. He further testified there is only a paint or lacquer type odor in the immediate vicinity of the landfill, although a paper mill press board siding manufacturer and another solvent reclamation plant are also in the area. According to Neal, the 1978 fire began when a bulldozer caught fire but resulted in no property damage or injuries to residents of the area. Since then, successful steps had been taken to avoid a recurrence of fire. Concerning spills from company trucks, Neal testified clean-up crews took care of any significant spills.

The county's expert geologist held a Bachelor of Science, Master of Science and Doctorate in geology. His background was largely an academic one, having been on the faculties of Catawba College and the College of Charleston. He testified he taught such courses as environmental geology and engineering geology. However, he had also been employed by Duke Power Company for seven years and had done some consulting work. He further testified he had obtained a grant to study sites for a sanitary landfill and had published numerous articles addressing geological questions about areas in North Carolina, South Carolina, Tennessee and Virginia. This expert visited the landfill site in question the month before trial and took several samples for study. He testified that, in

his opinion, the site is not a good one for a chemical landfill because there is little clay material to retard or absorb any seepage of chemicals into ground water when the metal barrels eventually erode.

In contrast, the company's geo-technical engineering expert, employed by a testing laboratory, held a Bachelor of Geological Engineering and a Master of Science in geology. He testified he had been employed by United States Steel Corporation at two separate locations and, following his graduate work at the University of Wyoming, had worked for an institute there before joining the testing laboratory. He further testified that in 1978, three years prior to trial, he was hired by Neal and had visited the landfill site to obtain samples and perform testing requested by DHEC. He analogized the waste material's present consistency to that of peanut butter and testified that, in his opinion, the landfill site is a good one because the permeability of the soil is very low. However, he went on to testify that although the landfill area does not contain a significant amount of clay and the metal barrels could be expected to disintegrate, in his opinion, the waste material would not flow with the ground water to adjacent properties and the Catawba River until the passage of thousands of years. (This opinion was based on one permeability test which he performed in August of 1978 on soil samples taken from a single hole on the property. The county's expert testified that, after viewing the property, he did not believe a permeability test was even necessary.)

A solid waste consultant from DHEC testified the landfill had passed his monthly visual inspectons from January-June 1981. During two of those inspectioins barrels were being buried, but he smelled no offensive odor. Even though the barrels were capped, the consultant stated there could be leakage.

Two EPA employees testified they had initially inspected the site in October 1979 and, due to questions concerning the results, had performed a follow-up inspection in June 1980. The samples taken, including a stream sample, passed inspection and no citations were issued. According to one of these witnesses, the EPA does not make subsequent periodic investigations.

In addition, the company presented an odor expert who had

performed odor tests at the York County facility, which in his opinion would emit an odor even stronger than that at the landfill site. (The landfill was closed at the time of his testing.) It was his opinion that the odor at the York County facility would travel only 1200 feet. He also testified that it is possible to differentiate between chemical smells.

The company now argues that the trial judge did not give sufficient weight to its state and federal permits and erred in finding the landfill constitutes a public nuisance by virtue of its location and method of operation. The company also alleges error in the trial judge's refusal to allow the company to abate any nuisance and refusal to dismiss or disregard the advisory jury due to allegedly prejudicial remarks made during the county's closing argument.

Initially, we must address the standard of review applicable here. The county argues this court should adopt the "two-judge rule" which prohibits disturbing factual findings unless they are without evidentiary support or against a clear preponderance of the evidence. *See Townes Associates, Ltd. v. City of Greenville*, 266 S. C. 81, 221 S. E. (2d) 773 (1976). The county apparently bases this argument on either (1) the earlier participation of another circuit judge who found the landfill constituted a public nuisance by virtue of its method of operation and issued a temporary injunction, or (2) the use of an advisory jury at the later hearing involved in this appeal, which found the landfill constituted a public nuisance both by virtue of its location and method of operation. The company, however, urges this court to adopt the standard of review applied in equity cases tried without a reference. Under that standard, we would have jurisdiction to find facts in accordance with our view of the preponderance of the evidence. *Townes*. We reject the first basis of the county's argument out of hand and will proceed to the second.

In an equity case the presiding judge has the right and power to refer issues to a jury for the enlightenment of his conscience (independent of sections 15-23-70 and 15-33-70 of the 1976 Code of Laws of South Carolina) and is not bound to accept their verdict. *Momeier v. McAlister, Inc.*, 190 S. C. 529, 3 S. E. (2d) 606 (1939); *In Re Nightingale's Estate*, 182 S. C. 527, 189 S. E. 890 (1937).

Here, the trial judge impaneled an advisory jury and

■ specifically reserved the right to make his own findings of fact and draw his own conclusions of law. The jury having served in an advisory capacity only, we will review the evidence as if the trial judge sat without a jury and thus find facts in accordance with our view of the preponderance of the evidence. *See Newbold v. McCrorey*, 103 S. C. 299, 87 S. E. 542, *modified on other grounds*, 103 S. C. 299, 87 S. E. 1103 (1916) (in equity case where issue was submitted to jury for mere purpose of enlightening conscience of trial court, Supreme Court was at liberty to "determine facts" contrary to findings made by jury). *Cf. Johnstone v. Matthews*, 183 S. C. 360, 191 S. E. 223 (1937) (language indicates the "any evidence" standard does not apply to findings by a jury to which issues are referred for enlightenment of trial judge's conscience); *Metcalf v. Mauldin Manufacturing Company, Inc.*, 264 S. C. 196, 213 S. E. (2d) 729 (1975) (where trial judge impaneled jury but reserved right to dismiss them at any time, Supreme Court found there was no doubt issues were finally determined by the court and not the jury; findings of fact were " amply supported" by evidence; standard of review applied is unclear).[1] However, under the facts at hand, the findings of the trial judge here can be affirmed under either standard of review.

The company first argues the trial judge did not give ■ sufficient weight to its state and federal permits. Although it concedes the South Carolina Hazardous Waste Management Act[2] and the Federal Solid Waste Disposal Act[3] do not preempt South Carolina common law nuisance actions, the company argues deference should be given to state and federal environmental authorities. As support for this proposition, the company cites *City of Milwaukee v. Illinois*, 451 U. S. 304, 101 S.Ct. 1784, 68 L. Ed. (2d) 114 (1981),

---

[1] We are also aware of equity cases which appear to adopt a different standard. However, in those cases it is unclear whether the jury served only in an advisory capacity, and the trial judge concurred in and adopted the jury's findings and verdict, *E.g., Pressley v. Kemp*, 16 S. C. 334 (1880) (Supreme Court stated it could reconsider all the evidence, but also stated a jury's verdict is as strong as a referee's report and concluded the judgment was against the weight of the evidence); *Thigpen v. Thigpen*, 217 S. C. 322, 60 S. E. (2d) 621 (1950) (Supreme Court applied "any evidence" standard of review to jury's conclusions).

[2] S. C. Code Ann. §§ 44-56-10 to -210 (Supp. 1983).

[3] 42 U.S.C.A. §§ 6901-6987 (1983).

and *New England Legal Foundation v. Costle*, 666 F. (2d) 30 (2d Cir. 1981). In *City of Milwaukee*, the Supreme Court held the Federal Water Pollution Control Act displaces federal common law with respect to claims brought by states. States cannot maintain federal common law actions to abate nuisances or impose more stringent standards than those of the federal act. However, the Court stated that, as to in-state discharges, states may adopt more stringent limitations through state nuisance law. In addition, the federal citizen-suit provision there, similar to that in the Solid Waste Disposal Act here, preserves common law actions. *New England Legal Foundation*, which relied on *City of Milwaukee*, held only that federal courts should not fashion federal equitable remedies (based on federal common law) to enjoin activity approved by a federal agency. Obviously, the trial court here applied state, not federal, common law.

Furthermore, contrary to the company's argument, the trial judge devoted two pages of his opinion to consideration of its state and federal permits. Concluding a nuisance is not excused by the fact it arises from a lawful business, the trial judge quoted the following language from *Young v. Brown*, 212 S. C. 156, 170, 46 S. E. (2d) 673, 679 (1948):

> A lawful business should not be enjoined on account of every trifling or imaginary annoyance, such as may offend the taste or disturb the nerves of a fastidious or over-sensitive person, but on the other hand no one, whatever his circumstances or condition may be, should be compelled to leave his home or live in mental discomfort, although caused by a lawful and useful business carried on in his vicinity.

We find the trial judge balanced the interests involved and gave sufficient weight to the state and federal permits held by the company.

Secondly, the company argues the trial judge erred in finding the landfill constitutes a public nuisance by virtue of its location and method of operation.

A nuisance is anything which works hurt, inconvenience, or damage; anything which essentially interferes with the enjoyment of life or property. *Strong v. Winn-Dixie Stores, Inc.*, 240 S. C. 244, 125 S. E. (2d) 628 (1962).

A nuisance *per accidens* is an act, occupation or structure which is not a nuisance per se, but which may become a nuisance by reason of circumstances, location[4] or surroundings. *Strong.* To constitute a public nuisance, a nuisance must be in a public place or where the public frequently congregates, or where members of the public are likely to come within the range of its influence. *Morison v. Rawlinson,* 193 S. C. 25, 7 S. E. (2d) 635 (1940). If the use of property is in a remote and infrequented locality, it will not be a nuisance *per se* unless malum *in se,* or a wrong in itself. *Morison.* A public nuisance will be enjoined where injury is inevitable and undoubted. *Morison.*

The findings that a business operation constitutes a ▮ nuisance is one of fact. *Strong.* Based upon our review of the preponderance of evidence previously discussed, we do not find the landfill is in a remote and infrequented locality. Instead, we find it is a public nuisance by virtue of its location near residential areas and the primary water source as well as its influence on members of the public. In light of this finding, we need not address the question of whether the landfill is also a public nuisance by virtue of its method of operation.

In addition, the company submitted a plan of abatement to the trial judge in post-trial briefs. The company argues it should have been given the opportunity to abate the nuisance before a permanent injunction was issued. The proposed plan of abatement has not been made part of the record on appeal, and we therefore have no way of reviewing what the company sought to propose. Furthermore, in view of our determination on the location issue, it does appear that the nuisance can be abated by a change in the company's method of operation. However, the company can, of course, later seek to have the injunction here modified or vacated if it can show change in the factual basis on which it was issued. *Edlis, Inc. v. Miller,* 132 W. Va. 147, 51 S. E. (2d) 132 (1948) (court of equity has inherent power to modify or

---

[4] "A nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard." *Village of Euclid, Ohio v. Ambler Realty Co.,* 272 U. S. 365, 388, 47 S. Ct. 114, 118, 71 L.Ed. 303, 311 (1926), *quoted in Village of Wilsonville v. SCA Services, Inc.,* 86 Ill. (2d) 1, 426 N. E. (2d) 824, 839 (1981).

vacate permanent injunction upon showing of change in conditions); *Stuart v. Lake Washington Realty Corporation,* 141 W. Va. 627, 92 S. E. (2d) 891 (1956) (power to modify or vacate permanent injunction according to facts and circumstances of particular case rests in sound discretion of trial court); 43A C.J.S. *Injunctions* § 280 (1978).

Finally, the company argues the following remarks made by the county's attorney during closing argument prejudiced its case such that the trial judge erred in refusing to dismiss or disregard the advisory jury: "How long do we have to wait. Do we have to wait for another Love Canal...." Upon objection by the company's attorney, the trial judge instructed the advisory jury to disregard these remarks.

Ordinarily, the conduct of a trial, including the control of arguments by counsel, must be left largely to the discretion of the trial judge. *Bowers v. Watkins Carolina Express, Inc.,* 259 S. C. 371, 192 S. E. (2d) 190 (1972). In his order, the trial judge here characterized the remarks in question as "incompetent or irrelevant," but properly determined that any prejudice was cured by his instruction to the jury. *See City of Columbia v. Myers,* 278 S. C. 288, 294 S. E. (2d) 787 (1982); *Epting v. Brumble,* 264 S. C. 114, 212 S. E. (2d) 711 (1975); *Smoak v. Seaboard Coast Line Railroad Company,* 259 S. C. 632, 193 S. E. (2d) 594 (1972). As previously discussed, he was not bound by the verdict of the advisory jury, but made his own findings of fact and reached his own conclusions of law.

In light of all the above, the order of the circuit court is affirmed.

GARDNER and GOOLSBY, JJ., concur.