2052

Robert W. RAVAN, Mavis O'Shields, Nellie E. Gillespie, and Tommy G. Fuller and Mary B. Fuller, Appellants/Respondents v. GREENVILLE COUNTY, Morton International, Para-Chem Southern, Inc., Hoechst Celanese Corporation, J.P. Stevens & Co., Inc., and Waste Management of South Carolina, Inc., Respondents. And of whom Appeal of Greenville County and Waste Management of South Carolina, Inc., are, Respondents/Appellants.

(434 S.E. (2d) 296)

Court of Appeals

*J. Kendall Few* and *John C. Few;* and *W. Harold Christian, Jr.,* of *Christian, Moorehead & Davis,* Greenville, *for appellants/respondents.*

*Reginald L. Foster,* of *Holcombe, Bomar, Wynn, Cothran & Gunn, P.A.,* Spartanburg; *Bradford W. Wyche* and *William W. Kehl,* both of *Wyche, Burgess, Freeman & Parham,* Greenville, *for respondents/appellants.*

*John B. McLeod,* of *Haynsworth, Marion, McKay & Guerard,* Greenville; and *M. Bradford Sanders,* of *Taft, Stellinius & Hollister,* Cincinnati, OH, *for Morton Intern.*

*Eric C. Schweitzer, L. Gray Geddie, Jr.,* and *Ronald E. Cardwell,* all of *Ogletree, Deakins, Nash, Smoak & Stewart,* Greenville, *for Para-Chem Southern, Inc.* and *Hoechst Celanese Corp.*

*Joseph A. Rhodes, Jr.,* of *Haynsworth, Baldwin, Johnson & Greaves,* Greenville, *for J.P. Stevens & Co., Inc.*

Heard Feb. 17, 1993.

Decided July 12, 1993.

CURETON, Judge:

This appeal involves four separate lawsuits which were consolidated for trial. The lawsuits arose out of the operation of a landfill by Greenville County on property leased from Carl Putnam. The landfill operated for less than six months in 1972.[1] The appellant landowners sued Greenville County and the corporate respondents alleging damage to their properties, which are adjacent to or a part of the landfill site. A jury awarded damages to the landowners against all respondents. The landowners' primary complaint is that the damages they were awarded are insufficient. We affirm in part and reverse in part.

The landowners alleged that in 1972 Greenville County had operated the landfill without a permit and in violation of applicable regulations of the State Department of Health. They also claimed the corporate respondents had contaminated their properties by depositing large quantities of hazardous, cancer-causing chemicals into the landfill.

The landowners stated causes of action against Greenville County for inverse condemnation, breach of covenant of title, breach of contract, strict liability, trespass, negligence and recklessness, and nuisance. They asserted causes of action against the corporate respondents in strict liability, trespass, negligence and recklessness, and nuisance. The county and corporate respondents asserted several defenses, including general denial, assumption of the risk, and the statute of limitations.

Following trial motions, the only cause of action submitted to the jury against Greenville County was that of inverse condemnation. As to the corporate respondents, the jury considered causes of action based on negligence and strict liability. The jury returned verdicts against Greenville County in in-

---

[1] The county established the landfill because a permanent replacement for the main county landfill, which was full, was not yet available. It intended to operate the landfill on a temporary basis for less than 90 days. Although the county requested a temporary permit to operate the landfill for solid waste disposal, there is no indication a temporary permit was ever issued.

verse condemnation and against the corporate respondents in negligence as follows:

| LANDOWNER | GREENVILLE COUNTY | CORPORATE RESPONDENTS |
|-----------|-------------------|-----------------------|
| Ravan | $4,279 | $21,395 |
| O'Shields | 825 | 3,300 |
| Gillespie | 1,042 | 4,168 |
| Fuller | 1,425 | 5,700 |

The landowners moved for a new trial on the ground of inadequacy of the verdicts and with respect to portions of the jury charges. Waste Management of South Carolina, Inc. (Waste Management) moved for a directed verdict and for judgment N.O.V. Greenville County moved to require the landowners to elect between the damages awarded against the county in inverse condemnation and those awarded against the corporate respondents in negligence. They argue election was necessary to avoid double recovery. The trial judge denied all motions.

## I.
## THE LANDOWNERS' APPEAL

### A.

The landowners first argue the verdicts are so grossly inadequate as to demonstrate the jury was influenced by considerations not founded on the evidence. We disagree.

In July and August of 1989, the Environmental Protection Agency and the South Carolina Department of Health and Environmental Control (DHEC) notified the landowners that testing of their wells revealed the presence of volatile organic contaminants in their drinking water. The letters further stated that although the concentrations detected did not exceed the maximum contaminant level established for the protection of drinking water, the agencies recommended that the landowners use alternate water sources for drinking and cooking.

All landowners testified to personal inconvenience, loss of enjoyment of their land, and their belief that the use of their properties posed health hazards to them and their families. They testified to individual damages as follows.

O'Shields testified her husband had purchased the land for

her in 1983 for $9,000 with the intent of constructing a home. They installed a well and septic tank, planted trees, dug a basement for their proposed home, and started to build a driveway. They paid approximately $3,000 for the well and $2,000 for the septic tank. They also purchased sand, gravel, and asphalt for the driveway, costing "a couple of thousand dollars," and bought a trailer in July 1987 at a cost of $1,500.

After she received notice that her well water was contaminated, she and her family discontinued drinking the water although they continued to use it for bathing. After enduring this situation for approximately two months, she "couldn't stand it any longer [and] had to get out of there." As a consequence, she moved her trailer to another location at a cost of approximately $3,500. She testified her property has no present value.

Gillespie testified that she had cleared her land, built a driveway at a cost of $300, put a mobile home on the lot, and planted trees and flowers. She had planned to build an addition to her mobile home. She described cracks in her back and side yards. She found an alternative source of drinking water until she and the other residents were supplied with public water several months after they learned of the contamination. When asked to put a value on her property without the contamination, she responded: "Well, I know I couldn't put a price on my land because I enjoyed living there and it is the only home I ever had." She claimed her property has no present value.

Ravan testified he had built his house in 1980 at a cost of $50,000, with an addition in 1987 at a cost of $32,000. He installed a swimming pool in 1985 at a cost of $10,000. He testified that without the contamination his house would be worth between $140,000 and $150,000, but with the contamination it has no value. He also testified that he had to purchase water for eight to nine months. He further testified although he had listed his house for sale in 1988 at a price of $96,500, he found no buyer. He contends that without the contamination his property would have increased approximately fifty percent above its value in 1988.

The Fullers testified they had bought their lot in 1987 for $10,00. They improved the lot by filling craters, placing a trailer on it, installing a driveway at a cost of $1,000, planting

trees and flowers, building a shop at a cost of $7,000 to $8,000, installing a fence at a cost of $1,000, and installing a well at a cost of $3500. They stopped drinking the well water when they learned of the contamination and bought water for about a year. They stated that they do not feel safe using the lot. Mr. Fuller testified that although the lot would be worth approximately $50,000 uncontaminated, it has no present value.

The landowners' expert, a toxicologist, tested the landowners' properties and found dangerous chemicals in the ground water and air vapors. He further testified he had serious reservations about the landowners living on their properties. He later testified, however, that the landowners' access to public water alleviated his concerns to some extent. Their real estate expert testified that the landowners' properties had decreased approximately 70% in value because of the contamination.

The corporate respondents presented the testimony of two expert witnesses. The first, a toxicologist, testified that the low-level contamination of the groundwater on the landowners' properties did not pose a health threat and should not adversely affect the marketability of the properties. The other witness, an expert real estate appraiser, testified that recent sales of properties located in the immediate area of the landowners' properties confirmed his opinion that the low-level contamination had not adversely affected the market values of the landowners' properties. He testified that he appraised Ravan's property at $102,000, Gillespie's at $20,840, Fuller's at $28,250, and O'Shields' at $16,500. He stated that the well contamination had no impact on value since the landowners now have public water. He discounted the landowners' expert's opinion that their land had decreased in value by 70% as being without foundation.

The question of the inadequacy of damages is addressed to the sound discretion of the trial judge. His discretion will not be questioned on appeal unless his finding is wholly unsupported by the evidence or there has been an abuse of discretion amounting to an error of law. *South Carolina State Highway Dep't v. Clarkson*, 267 S.C. 121, 126, 226 S.E. (2d) 696, 697 (1976); *Toole v. Toole*, 260 S.C. 235, 239, 195 S.E. (2d) 389, 390 (1973). The test which guides this Court in the exercise of its power and duty to set aside a

verdict on the ground of inadequacy is whether the verdict is so shocking and outrageous "as to manifestly show that the jury was actuated by considerations not founded on the evidence and/or the instructions of the court." *Toole,* 260 S.C. at 240, 195 S.E. (2d) at 391.

In *Clarkson,* our Supreme Court held that where the issue of the adequacy of the verdict rests on a conflict in the testimony of the witnesses, the trial court's denial of a motion for a new trial will not be disturbed on appeal. 267 S.C. at 126-27, 226 S.E. (2d) at 697. The record in this case shows that the testimony was in conflict on the issue of damages. The amount by which the landowners' properties diminished in value was clearly in dispute. Likewise, there was a sharp disagreement among the witnesses as to the degree or the severity of the contamination of the landowners' property and whether the expenditures and costs were warranted.

"Judging the credibility of testimony of witnesses is a function of the jury, not the court, as is determining the weight to be given that testimony." *Davenport v. Walker,* 280 S.C. 588, 591, 313 S.E. (2d) 354, 356 (Ct. App. 1984) (citation omitted). Given the disputed facts regarding damages, the jury's verdicts were neither outrageous or shocking. They were, in fact, within the range of damages testified to at trial. Nothing in the record indicates that the verdicts were based on considerations other than the evidence or that the jury disregarded the court's instructions. We, therefore, affirm this issue.

### B.

The landowners next argue the jury improperly apportioned damages among the respondents.

They argue the jury's award of $4,279 against the county and $21,395 against the other five defendants in the Ravan case,[2] is proof it multiplied the damages awarded against the county times five to arrive at the collective verdict against the corporate respondents. Likewise, in the O'Shields, Gillespie, and Fuller cases, they reason that the amount awarded against the county was multiplied by four to arrive at the collective verdicts against the four corporate respondents.

The landowners speculate that the jury sought to apportion damages among respondents, but cite no au-

---

[2] Waste Management was named as a defendant only in Ravan's suit.

thority for their contention that this is reversible error. The theory of apportionment of damages involves a jury returning separate verdicts against joint tortfeasors. *See Rourk v. Selvey,* 252 S.C. 25, 31, 164 S.E. (2d) 909, 913 (1968). Our review of the record suggests the jury did not attempt to apportion damages. In any event, the landowners' speculation as to how the jury arrived at its verdicts was raised for the first time on appeal and provides no basis for reversing the verdicts. *Hoffman v. Powell,* 298 S.C. 338, 340 n. 2, 380 S.E. (2d) 821, 822 n. 2 (1989). We dismiss this ground for appeal because it is without merit.

## C.

The landowners excepted to the trial court's refusal to charge the jury that "violation of [a] State or Federal statute or regulation [of a] state agency [is] sufficient evidence of recklessness" and that the respondents were required to follow such regulations. The trial judge allowed the jury to decide whether the regulations were applicable and whether they had been violated. The jury returned a verdict for actual damages, but found the corporate respondents were not guilty of recklessness.

The trial judge gave the following instructions on the issues of violation of regulations, willful, wanton, or reckless conduct, and punitive damages:

Ladies and gentlemen, there have been certain regulations referred to and in these regards these have been offered into evidence. You will have them with you to review and to consider and I do bring to your attention and do instruct you that if you determine that there is an applicable regulation, if you determine that there has been a violation of an applicable regulation, then in that event violation of such a regulation is negligence per se. . . . So, your remaining concern would be then whether such violation was a proximate or a direct cause of damage. I further instruct you that violation of an applicable regulation does not only of itself constitute recklessness or willfulness or wantonness. But should you determine that there has been violation of an applicable regulation, then in that event you may consider such violation together with other evidence in ascertaining whether or not there has been proof of recklessness, willfulness or wantonness.

If this charge is considered as a whole, it is clear that the substance of the plaintiff's request to charge was fairly covered in the instruction given to the jury. *Varnadore v. Nationwide Mut. Ins. Co.*, 289 S.C. 155, 160, 345 S.E. (2d) 711, 715 (1986) (refusal of a request to charge is not error when the substance of the request is included in the general instructions); *LeVesque v. Clearwater Mfg. Co.*, 209 S.C. 494, 502-03, 41 S.E. (2d) 92, 95 (1947) (trial judge may refuse a request to charge if it is fairly covered by the instructions given).

The landowners contend that the request was insufficient and cite the cases of *Rhodes v. Lawrence*, 279 S.C. 96, 97, 302 S.E. (2d) 343, 344 (1983), and *Tant v. Dan River, Inc.*, 289 S.C. 325, 326, 345 S.E. (2d) 495, 496 (1986), for the principle of law that violation of an agency regulation is sufficient evidence of recklessness, willfulness, and wantonness to justify a punitive damages award. However, neither *Rhodes* nor *Tant* stands for the proposition that mere evidence of a statutory or regulatory violation must inevitably lead to a finding of recklessness or willfulness. Rather, as stated by our Supreme Court in *Rhodes,* "a jury question as to punitive damages [is] clearly presented given the well settled rule that a showing of statutory violation can be evidence of recklessness and willfulness." 279 S.C. at 97, 302 S.E. (2d) at 344; *see Cooper v. County of Florence*, 306 S.C. 408, 412 S.E. (2d) 417, 419 (1991); *see also Callison v. Charleston & W.C. Ry.*, 106 S.C. 123, 129, 90 S.E. 260, 262 (1916) (failure of a railroad company to give the required statutory signals warrants an inference of willfulness and wantonness, requiring the submission of that question to the jury).

Furthermore, in order for the violation of a regulation to warrant a finding of willful or wanton conduct, there must be some evidence that the defendant appreciated the likelihood of harm to the plaintiff and acted with indifference to the requirements of the regulation. *See Tant*, 289 S.C. at 326, 345 S.E. (2d) at 496. Whether the violation of a statute amounts to recklessness depends on all the circumstances and facts of the case. *See Callison,* 106 S.C. at 129, 90 S.E. at 262.

Moreover, before punitive damages may be awarded, there must be evidence the statutory or regulatory violation proximately contributed to the injury. *Cartee v. Lesley,* 290 S.C. 333, 337, 350 S.E. (2d) 388, 390 (1986). "Ordi-

narily, whether or not the statutory violation contributed as a proximate cause to the injury is a question for the jury." *Id.*; *see Cooper*, 412 S.E. (2d) at 419.

Therefore, we hold the charge as a whole was adequate to instruct the jury that violation of the regulations was sufficient evidence of willfulness and recklessness on which the jury could have based a punitive damages award.

## D.

The landowners next argue that remarks made by the judge during trial denied them a fair trial and the refusal of the corporate respondents' real estate expert witness to stand behind his appraisal renders his testimony untrustworthy. They argue these matters constitute grounds for a new trial.

During the trial the judge observed the landowners wanted a "Rolls Royce," but "[t]his is not a Rolls Royce case." He followed this remark with another: "[I]f the jury gives you [a] Rolls Royce, I will have to cut it down to a Chevrolet." Both remarks were made in the absence of the jury. The remarks were reported in the *Greenville News*.

Several months after trial, one of the jurors signed an affidavit stating that a third party had brought the judge's remarks to the attention of the jury but that the jurors had laughed about the remarks.

The corporate respondents' real estate appraiser testified regarding the value of Ravan's property after the contamination and essentially stated there had been no diminution in value. When Ravan sought to use the appraisal to refinance his property, the appraiser refused to sign the appraisal report or to permit its use by Ravan to refinance his home.

In March 1991, the landowners filed a motion in the trial court for a new trial based on these matters together with a motion in the Supreme Court to remand the case to the trial court for consideration of their trial court motion. The Supreme Court denied the motion on April 24, 1991.

We note first that we are precluded from granting a new trial based on these matters because the Supreme Court implicitly decided the new trial motion lacked merit by refusing to remand the case. *See Langley v. Boyter*, 286 S.C. 85, 87, 332 S.E. (2d) 100, 101 (1985); *cf. Balloon Plantation, Inc. v. Head Balloons, Inc.*, 303 S.C. 152, 156, 399 S.E.

(2d) 439, 441 (Ct. App. 1990) (this court is without authority to dismiss an appeal on the same ground the Supreme Court has previously denied a motion for dismissal). Secondly, the matters raised by the landowners are completely outside the record and may not form the basis for a reversal. Rule 209(h), SCACR ("The appellate court will not consider any fact which does not appear in the Record on Appeal."). Thirdly, the trial court has never ruled on these issues. *E.g., Talley v. South Carolina Higher Educ. Tuition Grants Comm.*, 289 S.C. 483, 487, 347 S.E. (2d) 99, 101 (1986) (an issue may not be raised for the first time on appeal). Lastly, our review of the trial judge's remarks in the context in which they were made convinces us that they were not intended to belittle the landowners or to minimize their damages. The court stated that the landowners were overrating their damages while the respondents were underrating the damages. We are not convinced that these remarks denied the landowners fair and impartial trial.

### E.

The landowners requested the court charge the jury that the disposal of toxic, cancer-causing chemicals is an abnormally dangerous activity as a matter of law. The trial court denied the request and the jury found for the corporate respondents on the strict liability issue.

The landowners argue the court should not have submitted the question of strict liability to the jury, but should have determined this question as a matter of law.

It is well settled in South Carolina that in order to warrant reversal of the trial judge for failure to give a requested charge, the refusal must have been both erroneous and prejudicial. *Ellison v. Parts Distributors, Inc.*, 302 S.C. 299, 301, 395 S.E. (2d) 740, 741 (Ct. App. 1990). The extent to which the common law recognizes strict liability is limited to a few narrowly defined categories such as cattle trespass, public callings, certain kinds of nuisances, and ultrahazardous activities. *Snow v. City of Columbia*, 305 S.C. 544, 549-50, 409 S.E. (2d) 797, 800 (Ct. App. 1991).

The corporate respondents argue there was no error in refusing the charge because the appellate courts of this state have not held that the disposal of toxic chemicals is an abnor-

mally dangerous activity. *See Hatfield v. Atlas Enterprises, Inc.*, 274 S.C. 247, 249, 262 S.E. (2d) 900, 901 (1980) (no error in trial court's refusal to charge handling of fireworks was an abnormally dangerous activity when strict liability had not been extended to encompass that activity by our Supreme Court).

While South Carolina has adopted strict liability standards for cattle trespass, product liability, and unprovoked dog bite cases,[3] our legislature and Supreme Court have not declared that one engaged in handling dangerous chemicals is strictly liable for damages caused by those activities.

However, a current trend of legal thought suggests that those who manufacture, handle, and store abnormally dangerous pollutant substances should be held strictly liable for injury resulting from those activities. *City of Bridgeton v. B.P. Oil, Inc.*, 146 N.J. Super. 169, 369 A. (2d) 49, 53-54 (1976); 3 Susan M. Cooke, *The Law of Hazardous Waste: Management, Cleanup, Liability & Litigation* § 17.-01[5][a], at 17-74, 17-75 (1987); *see State v. Ventron Corp.*, 94 N.J. 473, 468 A. (2d) 150, 157 (1983) (a party who stores a pollutant is strictly liable for damages caused by the pollutant); *Indiana Harbor Belt R.R. v. American Cyanamid Co.*, 517 F. Supp. 314, 320 (N.D. Ill. 1981) (plaintiff is able to state a claim under Illinois law in strict liability against a manufacturer and shipper of a toxic chemical); *see also* Note, *Strict Liability for Generators, Transporters, and Disposers of Hazardous Waste*, 64 Minn. L. Rev. 949 (1980) (examines strict liability as a basis for recovery from producers, transporters, and disposers of hazardous waste).

Whether an activity is abnormally dangerous must be determined on a case by case basis. *T & E Industries, Inc. v. Safety Light Corp.*, 123 N.J. 371, 587 A. (2d) 1249, 1259 (1991).

The authorities are split over whether the court or the jury should make the determination that a particular activity is abnormally dangerous. *Erbrich Products Co. v. Wills*, 509 N.E. (2d) 850, 857 (Ind. Ct. App. 1987) (a question of law for the

---

[3] *Hossenlopp v. Cannon*, 285 S.C. 367, 372, 329 S.E. (2d) 438, 441 (1985) (The court described the standard as falling short of a strict liability rule, suggesting that strict liability would not be imposed on an owner if the attack had been provoked).

court); *Indiana Harbor Belt R.R.*, 517 F. Supp. at 317 (a question of law for the court); *McLane v. Northwest Natural Gas Co.*, 255 Or. 324, 467 P. (2d) 635, 637 (1970) (a question of law for the court); *Restatement (Second) of Torts* § 520 cmt. 1 (1977) (whether the activity is abnormally dangerous is to be determined by the court). *Compare Harper v. Regency Development Co.*, 399 So. (2d) 248, 253 (Ala. 1981) (a finding of liability guided by a consideration of the factors outlined in *Restatement (Second) of Torts* § 520 will normally be for the jury); *Zero Wholesale Gas Co. v. Stroud*, 264 Ark. 27, 571 S.W. (2d) 74, 76-77 (1978) (jury must determine whether an activity is ultrahazardous).

The trial judge instructed the jury that it could find the corporate respondents' activities abnormally dangerous by considering the factors outlined in *Restatement (Second) of Torts* § 520. Were we to adopt the *Restatement's* criteria, we would not be inclined to hold the corporate respondents' activities were abnormally dangerous as a matter of law. However, we leave that determination to our Supreme Court should it consider further review of this case.

At any rate, the landowners cannot show that they were prejudiced by the trial court's refusal to give the requested instruction. The jury returned a verdict for the landowners on their negligence cause of action. Their cause of action for strict liability was based upon the same facts and circumstances as the cause of action for negligence. The two causes of action do not provide for separate awards but exist only as separate theories of recovery.

Additionally, there can be no recovery of punitive damages based solely upon a finding of strict liability.

Therefore, we presume the jury's award would not have been any different had the landowners' requested instruction been charged. *See Daniel v. Hazel*, 242 S.C. 443, 448, 131 S.E. (2d) 260, 262 1963) (jury verdict for plaintiff generally negates any inference of prejudice although instructions were in error).

## F.

The final argument of the landowners is that the court improperly granted the respondents' directed verdict motions on the trespass and nuisance causes of action.

The trial court granted the respondents' motions for directed verdicts on the landowners' trespass and nuisance causes of action primarily because the landowners were not the owners of their properties at the time the dumping occurred in 1972. It also placed significance on the fact the landowners did not own land next to or adjacent to the landfill at the time of the dumping.

The landowners correctly note that a trespass is any interference with one's right to the exclusive, peaceable possession of his property. *Stratos v. King*, 292 S.C. 501, 504, 319 S.E. (2d) 356, 359 (Ct. App. 1984); *see Daniels v. Coleman*, 253 S.C. 218, 229, 169 S.E. (2d) 593, 598 (1969); *Lane v. Mims*, 221 S.C. 236, 239, 70 S.E. (2d) 244, 245 (1952). They also correctly note that a nuisance is "anything which works hurt, inconvenience, or damages; anything which essentially interferes with the enjoyment of life or property." *Neal v. Darby*, 282 S.C. 277, 285, 318 S.E. (2d) 18, 23 (Ct. App. 1984) (citing *Strong v. Winn-Dixie Stores, Inc.*, 240 S.C. 244, 253, 125 S.E. (2d) 628, 632 (1962)). However, the interference or inconvenience must be unreasonable to be actionable. *Frost v. Berkeley Phosphate Co.*, 42 S.C. 402, 409-10, 20 S.E. 280, 283 (1894).

At common law, the landowners' showing in this case would be insufficient to demonstrate trespass because of the requirement of an affirmative act resulting in direct harm to the landowners. *Snow*, 305 S.C. at 553, 409 S.E. (2d) at 802; *see* 5B Richard R. Powell & Patrick J. Rohan, *Powell on Real Property* § 865.6[4][c][ii][A], at 79A-460.40 (1993); 75 Am. Jur. (2d) *Trespass* § 9 (1991). Nevertheless, there is a trend in environmental law to recognize that the infiltration of contaminants onto a plaintiff's property constitutes as much an invasion of his possessory interest as the cutting of a tree on his property. *See* 1 Frank P. Grad, *Treatise on Environmental Law* § 3.05[3][b], at 3-431 (1992); Larry D. Schaefer, Annotation, *Recovery In Trespass For Injury To Land Caused By Airborne Pollutants*, 2 A.L.R. 4th 1054, 1055 (1980); William H. Rodgers, Jr., *Handbook on Environmental Law* § 2.13, at 154 (1977). Because the landowners claim a continuing trespass by the respondents, their lack of possession at the time of dumping presents no bar to recovery when they are presently being injured by contaminants previously in-

jected into the subterranean and percolating water table by respondents. *See* 75 Am. Jur. (2d) *Trespass* § 37 (1991).

We hold, nevertheless, that the trial court did not err in its refusal to permit the trespass cause of action to go to the jury. The essence of trespass is the unauthorized entry onto the land of another. *Snow*, 305 S.C. at 552, 409 S.E. (2d) at 802; *Whitley v. Jones*, 238 N.C. 332, 78 S.E. (2d) 147, 151 (1953) (citation omitted); *see* 75 Am. Jur. (2d) *Trespass* § 9 (1991). Our review of the record does not reveal an unauthorized entry. Here, respondents' entry into the landfill property was authorized by Putnam, its owner. Importantly, the landowners' properties are part and parcel of the very property the respondents had a license to enter in 1972.

As to the nuisance cause of action, the traditional concept of private nuisance requires the landowners to demonstrate that the respondents unreasonably interfered with their ownership or possession of the land. The distinction between trespass and nuisance is that trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property, whereas nuisance is a substantial and unreasonable interference with the plaintiff's use and enjoyment. William H. Rodgers, Jr., *Handbook on Environmental Law* § 2.13, at 154 (1977).

As in the trespass cause of action, because the landowners assert a continuing nuisance, their lack of possession of their lands at the time of dumping is not dispositive. A substantial obstacle to recovery under a nuisance cause of action, however, is the requirement the landowners show the respondents' interference with the use and enjoyment of their properties is unreasonable under the circumstances. *See Wood v. Picillo*, 443 A. (2d) 1244, 1247 (R.I. 1982). There must be a balancing of the equities. *McQuade v. Tucson Tiller Apartments, Ltd.*, 25 Ariz. App. 312, 543 P. (2d) 150, 152 (1975); *see Young v. Brown*, 212 S.C. 156, 169, 46 S.E. (2d) 673, 679 (1948) (due regard must be given to the correlative rights of the parties). However, the question of reasonableness is ordinarily a question of fact for the jury. *See Lever v. Wilder Mobile Homes, Inc.*, 283 S.C. 452, 454, 322 S.E. (2d) 692, 693 (Ct. App. 1984) (whether defendant's enterprise constituted a nuisance was a question for the jury); 58 Am. Jur. (2d) *Nuisances* § 74 (1989).

As to both the nuisance and trespass causes of action, we hold the landowners could not have been prejudiced by the failure of the court to submit these theories to the jury. The landowners sought to recover damages for permanent injuries to their properties and consequential damages associated with those injuries. The measure of damages for permanent injury to real property by pollution, whether by nuisance,[4] trespass, negligence, or inverse condemnation is the diminution in the market value of the property. *Gray v. Southern Facilities, Inc.*, 256 S.C. 558, 569, 183 S.E. (2d) 438, 443 (1971) (damage for permanent injury to property caused by pollution of a stream is diminution in the market value of the property); 61A Am. Jur. (2d) *Pollution Control* § 553 (1981); William H. Rodgers, Jr., *Handbook on Environmental Law* § 2.11, at 145, § 2.13, at 157 (1977). Because the landowners recovered in inverse condemnation for the diminution in property value and presumably in negligence for incidental and consequential damages, we discern no prejudice to them resulting from the court's failure to submit the nuisance and trespass causes of action to the jury.

## II.
## APPEAL OF GREENVILLE COUNTY

Greenville County asserts the trial court erred in denying its post-verdict motion to require the landowners to elect remedies. As noted above, the jury was allowed to consider only the inverse condemnation cause of action against the county but negligence and strict liability causes of action against the other respondents. The county argues that the landowners received a double recovery because the jury was allowed to award damages for diminution in the value of the landowners' properties based on both the negligence cause of action and the inverse condemnation cause of action. We disagree.

This argument is adequately addressed by the county in its response to the landowners' argument concerning the apportionment of damages. We quote from its brief:

---

[4] A nuisance presupposes negligence in many instances, if not in most, and the two torts may be coexisting and practically inseparable if the acts or omissions constituting negligence create a nuisance.

The jury was properly charged by the trial court that any damages awardable against Greenville County were to be measured by determining "the difference between what the fair market value of the property would be if there were not  contamination and the current market value." . . . The jury was properly instructed as to the measure of damages to be applied for the inverse condemnation of property. These were the *only* damages that could be awarded against Greenville County.

By like token, as to the negligence and strict liability causes of action the judge properly instructed the jury that it was entitled to go beyond the diminution of value to the Appellants' property and consider any consequential damages which may have been suffered by the Appellants. The Court correctly instructed the jury that in addition to any diminution of value it could award damages for 1) the deprivation of the Plaintiffs' exclusive possession of his or her property, 2) damages for the deprivation of the use and enjoyment of the property, and 3) damages relating to expenses incurred as a result of the Defendants' activities (references to the record omitted).

Thus, the jury was properly instructed that, insofar as Greenville County was concerned, only damages for diminution of value were appropriate. Our review of the record reveals no indication the jury went outside the scope of the judge's instructions in awarding damages. On the contrary, the jury awarded lesser amounts against Greenville County and greater amounts against the other defendants. These awards are within the range and scope of the evidence presented at trial. Also, they are logical considering the trial court's instruction on the elements of damages. There was evidence the landowners had not suffered any diminution of value to their property. There was also evidence relating to the landowners' consequential damages (for example, moving expenses, cost of bottled water, etc.). Accordingly, we find this argument to be without merit.

### III.
### APPEAL OF WASTE MANAGEMENT
Waste Management is the successor in interest to Spartan

Waste Control. It was a party only in the Ravan case. The jury returned a verdict against all the corporate respondents in the amount of $21,395. Waste Management's motion for judgment n.o.v. was denied. On appeal, Waste Management argues (1) it did not owe a duty of care to Ravan; (2) assuming a duty, that duty did not extend beyond its limited role of safely transporting the waste; (3) Spartan was not negligent; and (4) Ravan's damages, if any, were not proximately caused by Spartan's conduct.

In order for Ravan to recover in negligence against Waste Management, he must show Spartan had a duty of care not to dump toxic chemicals into the landfill, a breach of that duty (that it did in fact dump such chemicals into the landfill), a legally cognizable causal connection between the breach and the harm suffered, and resultant damages. William B. Johnson, Annotation, *Tort Liability For Pollution From Underground Storage Tank,* 5 A.L.R. 5th 1, 11 (1992).

We first consider whether Waste Management's predecessor, Spartan, had a duty of care to subsequent owners of land such as Ravan, and if so, whether that duty extended beyond safely collecting and hauling waste.

"A tortfeasor's duty arises from his relationship to the injured party." *South Carolina State Ports Authority v. Booz-Allen & Hamilton, Inc.,* 289 S.C. 373, 376, 346 S.E. (2d) 324, 325-26 (1986). It is essential to liability for negligence to attach that the parties shall have sustained a relationship recognized by law as the foundation of a duty of care. 57A Am. Jur. (2d) *Negligence* § 89 (1989). Where this relationship is "too attenuated," a duty will not arise. *South Carolina State Ports Authority,* 289 S.C. at 377, 346 S.E. (2d) at 326.

Waste Management argues that because the landfill was operated, maintained, and managed by Greenville County, Spartan's only culpability was in collecting and transporting waste generated by others. It asserts its relationship to Ravan, who did not become a "subsequent purchaser" until eight years after the landfill was closed, is far "too attenuated" to give rise to any kind of legal duty.

Waste Management further argues this Court should make a distinction between a mere transporter of waste and a generator of waste or the operator of the site that stores the

waste. As a transporter of waste, it argues its duty was to ensure that the waste was transported safely. It cites the case of *Kenny v. Scientific, Inc.*, 204 N.J. Super. 228, 497 A. (2d) 1310, 1328 (1985), in support of this proposition.

Ravan responds that the scientific community knew as early as 1961 that groundwater contaminated by chemicals would flow from one place to another and that there was evidence from which the jury could have found Spartan transported "harsh chemical" waste to the landfill.[5] He refers to the testimony of Paul Babbs, a county employee in 1972, that Spartan had brought harsh chemicals to the landfill. However, a fair reading of Babbs' testimony makes it clear he was referring to another landfill. Another employee of the landfill, Paul Rossi, recalled that Spartan had delivered drums of "liquid waste" to the landfill a "couple of times" but could not identify the contents of the drums. Also, James Rosemond, who worked at the landfill with Rossi, testified that Spartan had delivered drum of liquid waste but Rossi "would know more about that than me because he [had unloaded it]."

We agree that the duty of a mere hauler of hazardous waste extends only to the safe transport of the waste while it is in the hauler's possession and control. In *Kenney*, the court perceived "a significant difference between a company which brings abnormally hazardous waste into the world and one which as a conduit transports that waste without untoward incident." *Id.* at 1327. The court explained that a company which elects to go into the business of transporting abnormally dangerous waste is not free from the imposition of absolute liability of the waste escapes and causes injury while in its possession and control. *Id.* As to the negligence cause of action, the court directed its inquiry to whether the haulers were negligent in the choice of the landfill, or if they did not actually choose the landfill, whether they were negligent in making deliveries to a landfill they knew or should have known was dangerous. *Id.* at 1328.

Similarly, in *Commonwealth v. Pace*, 616 F. Supp. 815 (D. Mass. 1985), transporters were found not to be liable when their only activity was the hauling of waste to the site. The court noted that the release of chemicals at the site was not a

---

[5] Because the landfill was a solid waste landfill, Spartan's license to dump in the landfill did not extend to the dumping of chemical waste.

natural consequence of the transportation of waste. *Id.* at 821.

Here, however, there is evidence Waste Management's role consisted of more than the mere hauling of waste to the landfill. Waste Management's "driver supervisor" testified that in 1972 Waste Management was in the business of "disposing of waste from these industrial plants." Although the record does not explain the content of the agreement between Waste Management and its customers, it does show Waste Management purchased the tickets from the county that permitted dumping in the landfill. The record does not support the inference that Waste Management's customers contracted with the county to dump in its landfill and then simply employed Waste Management to transport the waste. Thus, the facts of this case support the conclusion that a duty of care was owed by Spartan Waste to Ravan.

Waste Management notes that even if the evidence shows Spartan transported liquid waste to the landfill in 1972 and thereby owes a duty of care to subsequent land owners, there is no evidence the contamination in Ravan's groundwater was proximately caused by anything Spartan Waste delivered to the landfill. Ravan counters that the evidence provides a sufficient basis from which the jury could have found Spartan Waste dumped dangerous liquid chemical waste into the landfill under circumstances that would impose a duty of care to those who may in the future come into contact with such chemicals through groundwater contamination.

Waste Management cites several cases for the proposition that where Ravan's injury may reasonably be attributable to an act for which Waste Management is not liable as to one for which it is liable, Ravan has failed to carry the burden of establishing that his injuries were proximately caused by Waste Management's activities. *Fowler v. Coastal Coca-Cola Bottling Co.*, 252 S.C. 579, 584, 167 S.E. (2d) 572, 575 (1969); *Messier v. Adicks*, 251 S.C. 268, 271, 161 S.E. (2d) 845, 846 (1968); *Ryan v. Eli Lilly & Co.*, 514 F. Supp. 1004, 1018 (D.S.C. 1981); *see also McGee v. Colonial Pipeline Co.*, 247 S.C. 413, 416, 147 S.E. (2d) 645, 646 (1966) (there must be evidence in the record to support the inference that defendant's negligence resulted in damage to the property). "Verdicts may not be permitted to rest on surmise, conjecture or speculation." *Gosnell v. South Carolina Dep't of Highways and*

*Public Transp.*, 282 S.C. 526, 532, 320 S.E. (2d) 454, 457 (Ct. App. 1984).

Taken in the light most favorable to Ravan the evidence simply shows that on a "couple of occasions" Spartan carried liquid waste to the landfill, but the evidence provides no hint of the content of that waste, that it was toxic, or that it in any way contributed to Ravan's groundwater contamination. Thus, Ravan was shown no causal connection between the hauling of liquid waste by Waste Management and his injuries. Waste Management's motion for judgment N.O.V. should have been granted.

## IV.
### RAVAN'S ADDITIONAL SUSTAINING GROUNDS

Ravan argues the denial of Waste Management's motion for judgment N.O.V. should be sustained because the disposal of hazardous chemicals is an abnormally dangerous activity. He makes the same assertions here that he made in his argument regarding why the trial judge should have charged the jury that the handling of these chemicals was abnormally dangerous as a matter of law. Having concluded the trial court did not err in refusing the charge on abnormally dangerous activities, we need not discuss this claim further.

Ravan also urges this court to utilize this case as the vehicle for applying the "insurance principle" of strict liability discussed by Judge Bell in *Snow v. City of Columbia*, 305 S.C. at 550, 409 S.E. (2d) at 800-01. This concept of "enterprise liability" in effect "makes the person engaged in an enterprise an insurer against harm which results therefrom without regard to fault on his part." 305 S.C. at 550, 409 S.E. (2d) at 800. Because we see no practical distinction between this principle of liability and the species of strict liability discussed above, we will engage in no further discussion of it.

Accordingly, the order of the trial court is reversed as to Waste Management. Otherwise, it is affirmed.

Affirmed in part, reversed, in part.

GOOLSBY, J., and LITTLEJOHN, Acting Judge, concur.