**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FOOD LION, INCORPORATED,
Plaintiff-Appellee,

v.

CAPITAL CITIES/ABC, INC.; LYNNE
LITT, a/k/a Lynne Neufes; ABC
HOLDING COMPANY; AMERICAN
BROADCASTING COMPANIES,
INCORPORATED; RICHARD N. KAPLAN;
IRA ROSEN; SUSAN BARNETT,
Defendants-Appellants,

ADVANCE PUBLICATIONS,
INCORPORATED; ASSOCIATED PRESS;
THE ASSOCIATION OF AMERICAN
PUBLISHERS; CBS BROADCASTING,
INCORPORATED; CABLE NEWS

NETWORK, INCORPORATED; GANNETT
COMPANY, INCORPORATED; THE
HEARST CORPORATION; KING WORLD
PRODUCTIONS, INCORPORATED;
MCCLATCHY NEWSPAPERS,
INCORPORATED; THE NATIONAL
ASSOCIATION OF BROADCASTERS;
NATIONAL BROADCASTING COMPANY,
INCORPORATED; THE NEWSPAPER
ASSOCIATION OF AMERICA; NATIONAL
PUBLIC RADIO, INCORPORATED; THE
NEW YORK TIMES COMPANY; THE
RADIO-TELEVISION NEWS DIRECTORS
ASSOCIATION; THE REPORTERS
COMMITTEE FOR FREEDOM OF THE
PRESS; INVESTIGATIVE REPORTERS;

No. 97-2492

EDITORS, INCORPORATED; NATIONAL GROCERS ASSOCIATION; INTERNATIONAL MASS RETAIL ASSOCIATION; WILLIAM E. LEE; JOHN DEMOTT; ROBERT ELLIS SMITH; MIKE

ROSEN; ACCURACY IN MEDIA; MEDIA RESEARCH CENTER; ATLANTIC LEGAL FOUNDATION; SOUTHEASTERN LEGAL FOUNDATION,
Amici Curiae.

FOOD LION, INCORPORATED,
Plaintiff-Appellant,

v.

CAPITAL CITIES/ABC, INC.; LYNNE LITT, a/k/a Lynne Neufes; ABC HOLDING COMPANY; AMERICAN BROADCASTING COMPANIES, INCORPORATED; RICHARD N. KAPLAN; IRA ROSEN; SUSAN BARNETT,

Defendants-Appellees,

ADVANCE PUBLICATIONS, INCORPORATED; ASSOCIATED PRESS; THE ASSOCIATION OF AMERICAN PUBLISHERS; CBS BROADCASTING, INCORPORATED; CABLE NEWS NETWORK, INCORPORATED; GANNETT COMPANY, INCORPORATED; THE HEARST CORPORATION; KING WORLD PRODUCTIONS, INCORPORATED;

No. 97-2564

2

MCCLATCHY NEWSPAPERS,
INCORPORATED; THE NATIONAL
ASSOCIATION OF BROADCASTERS;
NATIONAL BROADCASTING COMPANY,
INCORPORATED; THE NEWSPAPER
ASSOCIATION OF AMERICA; NATIONAL
PUBLIC RADIO, INCORPORATED; THE
NEW YORK TIMES COMPANY; THE
RADIO-TELEVISION NEWS DIRECTORS
ASSOCIATION; THE REPORTERS

COMMITTEE FOR FREEDOM OF THE
PRESS; NATIONAL GROCERS
ASSOCIATION; INTERNATIONAL MASS
RETAIL ASSOCIATION; WILLIAM E.
LEE; JOHN DEMOTT; ROBERT ELLIS
SMITH; MIKE ROSEN; ACCURACY IN
MEDIA; MEDIA RESEARCH CENTER;
ATLANTIC LEGAL FOUNDATION;
SOUTHEASTERN LEGAL FOUNDATION,
Amici Curiae.

Appeals from the United States District Court
for the Middle District of North Carolina, at Winston-Salem.
N. Carlton Tilley, Jr., Chief District Judge.
(CA-92-592-6)

Argued: June 4, 1998

Decided: October 20, 1999

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Michael wrote the opinion, in which Judge Motz joined. Judge Nie-

3

meyer wrote a separate opinion, concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Bruce J. Ennis, Jr., JENNER & BLOCK, Washington, D.C., for Appellants. Richard L. Wyatt, Jr., AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Paul M. Smith, Mark D. Schneider, Deanne E. Maynard, Michelle B. Goodman, Christopher A. Bracey, JENNER & BLOCK, Washington, D.C.; William H. Jeffress, Jr., Randall J. Turk, MILLER, CASSIDY, LARROCA & LEWIN, Washington, D.C.; Alan N. Braverman, Nathan Siegel, ABC, INCORPORATED, New York, New York; Kathleen M. Sullivan, STANFORD LAW SCHOOL, Stanford, California; Hugh Stevens, EVERETT, GASKINS, HANCOCK & STEVENS, Raleigh, North Carolina, for Appellants. Michael J. Mueller, Thomas P. McLish, AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., Washington, D.C.; W. Andrew Copenhaver, Timothy G. Barber, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Winston-Salem, North Carolina, for Appellee. Floyd Abrams, Gail Johnston, CAHILL, GORDON & REINDEL, P.C., New York, New York, for Amici Curiae Advance Publications, et al. David B. Smallman, SIMPSON, THACHER & BARTLETT, New York, New York, for Amicus Curiae Investigative Reporters. Thomas F. Wenning, Ronald A. Bloch, NATIONAL GROCERS ASSOCIATION, Reston, Virginia; Christopher A. Weals, Donald L. Rosenthal, SEYFARTH, SHAW, FAIRWEATHER & GERALDSON, Washington, D.C., for Amicus Curiae Grocers. Neal Goldfarb, TIGHE, PATTON, TABACKMAN & BABBIN, L.L.C., Washington, D.C., for Amici Curiae Lee, et al. Martin S. Kaufman, Edwin L. Lewis, Douglas Foster, ATLANTIC LEGAL FOUNDATION, INC., New York, New York, for Amicus Curiae Foundation. Valle Simms Dutcher, SOUTHEASTERN LEGAL FOUNDATION, Atlanta, Georgia; Charles J. Cooper, Michael W. Kirk, COOPER, CARVIN & ROSENTHAL, P.L.L.C., Washington, D.C., for Amicus Curiae Southeastern Legal.

_____

**OPINION**

MICHAEL, Circuit Judge:

Two ABC television reporters, after using false resumes to get jobs at Food Lion, Inc. supermarkets, secretly videotaped what appeared to be unwholesome food handling practices. Some of the video footage was used by ABC in a PrimeTime Live broadcast that was sharply critical of Food Lion. The grocery chain sued Capital Cities/ABC, Inc., American Broadcasting Companies, Inc., Richard Kaplan and Ira Rosen, producers of PrimeTime Live, and Lynne Dale and Susan Barnett, two reporters for the program (collectively,"ABC" or the "ABC defendants"). Food Lion did not sue for defamation, but focused on how ABC gathered its information through claims for fraud, breach of duty of loyalty, trespass, and unfair trade practices. Food Lion won at trial, and judgment for compensatory damages of $1,402 was entered on the various claims. Following a substantial (over $5 million) remittitur, the judgment provided for $315,000 in punitive damages. The ABC defendants appeal the district court's denial of their motion for judgment as a matter of law, and Food Lion appeals the court's ruling that prevented it from proving publication damages. Having considered the case, we (1) reverse the judgment that the ABC defendants committed fraud and unfair trade practices, (2) affirm the judgment that Dale and Barnett breached their duty of loyalty and committed a trespass, and (3) affirm, on First Amendment grounds, the district court's refusal to allow Food Lion to prove publication damages.

I.

In early 1992 producers of ABC's PrimeTime Live program received a report alleging that Food Lion stores were engaging in unsanitary meat-handling practices. The allegations were that Food Lion employees ground out-of-date beef together with new beef, bleached rank meat to remove its odor, and re-dated (and offered for sale) products not sold before their printed expiration date. The producers recognized that these allegations presented the potential for a powerful news story, and they decided to conduct an undercover investigation of Food Lion. ABC reporters Lynne Dale (Lynne Litt at the time) and Susan Barnett concluded that they would have a better

5

chance of investigating the allegations if they could become Food Lion employees. With the approval of their superiors, they proceeded to apply for jobs with the grocery chain, submitting applications with false identities and references and fictitious local addresses. Notably, the applications failed to mention the reporters' concurrent employment with ABC and otherwise misrepresented their educational and employment experiences. Based on these applications, a South Carolina Food Lion store hired Barnett as a deli clerk in April 1992, and a North Carolina Food Lion store hired Dale as a meat wrapper trainee in May 1992.

Barnett worked for Food Lion for two weeks, and Dale for only one week. As they went about their assigned tasks for Food Lion, Dale and Barnett used tiny cameras ("lipstick" cameras, for example) and microphones concealed on their bodies to secretly record Food Lion employees treating, wrapping and labeling meat, cleaning machinery, and discussing the practices of the meat department. They gathered footage from the meat cutting room, the deli counter, the employee break room, and a manager's office. All told, in their three collective weeks as Food Lion employees, Dale and Barnett recorded approximately 45 hours of concealed camera footage.

Some of the videotape was eventually used in a November 5, 1992, broadcast of PrimeTime Live. ABC contends the footage confirmed many of the allegations initially leveled against Food Lion. The broadcast included, for example, videotape that appeared to show Food Lion employees repackaging and redating fish that had passed the expiration date, grinding expired beef with fresh beef, and applying barbeque sauce to chicken past its expiration date in order to mask the smell and sell it as fresh in the gourmet food section. The program included statements by former Food Lion employees alleging even more serious mishandling of meat at Food Lion stores across several states. The truth of the PrimeTime Live broadcast was not an issue in the litigation we now describe.

Food Lion sued ABC and the PrimeTime Live producers and reporters. Food Lion's suit focused not on the broadcast, as a defamation suit would, but on the methods ABC used to obtain the video footage. The grocery chain asserted claims of fraud, breach of the duty of loyalty, trespass, and unfair trade practices, seeking millions

6

in compensatory damages. Specifically, Food Lion sought to recover (1) administrative costs and wages paid in connection with the employment of Dale and Barnett and (2) broadcast (publication) damages for matters such as loss of good will, lost sales and profits, and diminished stock value. Punitive damages were also requested by Food Lion.

The district court, in a remarkably efficient effort, tried the case with a jury in three phases. At the liability phase, the jury found all of the ABC defendants liable to Food Lion for fraud and two of them, Dale and Barnett, additionally liable for breach of the duty of loyalty and trespass. Based on the jury's fraud verdict and its special interrogatory findings that the ABC defendants had engaged in deceptive acts, the district court determined that the ABC defendants had violated the North Carolina Unfair and Deceptive Trade Practices Act (UTPA). Prior to the compensatory damages phase, the district court ruled that damages allegedly incurred by Food Lion as a result of ABC's broadcast of PrimeTime Live -- "lost profits, lost sales, diminished stock value or anything of that nature" -- could not be recovered because these damages were not proximately caused by the acts (fraud, trespass, etc.) attributed to the ABC defendants in this case. See Food Lion, Inc. v. Capital Cities/ABC, Inc., 964 F. Supp. 956, 958 (M.D.N.C. 1997) (setting forth rationale for ruling at trial). Operating within this constraint, the jury in the second phase awarded Food Lion $1,400 in compensatory damages on its fraud claim, $1.00 each on its duty of loyalty and trespass claims, and $1,500 on its UTPA claim. (The court required Food Lion to make an election between the fraud and UTPA damages, and the grocery chain elected to take the $1,400 in fraud damages.) At the final stage the jury lowered the boom and awarded $5,545,750 in punitive damages on the fraud claim against ABC and its two producers, Kaplan and Rosen. The jury refused to award punitive damages against the reporters, Dale and Barnett. In post-trial proceedings the district court ruled that the punitive damages award was excessive, and Food Lion accepted a remittitur to a total of $315,000.

After trial the ABC defendants moved for judgment as a matter of law on all claims, the motion was denied, and the defendants now appeal. Food Lion cross-appeals, contesting the district court's ruling that the damages the grocery chain sought as a result of the

7

PrimeTime Live broadcast were not recoverable in this action. We now turn to the legal issues.

II.

A.

We must first consider whether the ABC defendants can be held liable for fraud, breach of the duty of loyalty, and trespass as a matter of North Carolina and South Carolina law and whether the North Carolina UTPA applies. As a federal court sitting in diversity, we are obliged to interpret and apply the substantive law of each state. See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). This process is more complicated here because neither state's highest court has applied its law to circumstances exactly like those presented in this case. Thus, we must offer our best judgment about what we believe those courts would do if faced with Food Lion's claims today. See Hatfield v. Palles, 537 F.2d 1245, 1248 (4th Cir. 1976) (noting that when "[t]here have been no decisions by the South Carolina Supreme Court . . . [a] federal court must . . . endeavor to decide the issue in the way it believes the South Carolina Supreme Court would decide it."). In conducting our analysis, we may of course consider all of the authority that the state high courts would, and we should give appropriate weight to the opinions of their intermediate appellate courts. Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967) (noting that when there is no decision by a state's highest court, federal court must apply what it "find[s] to be the state law after giving `proper regard' to relevant rulings of other courts of the State."); Sanderson v. Rice, 777 F.2d 902, 905 (4th Cir. 1985) (noting that "[a]n opinion of an intermediate appellate court is persuasive in situations where the highest state court has not spoken"). Finally, we review de novo the district court's determinations on these questions of state law. Salve Regina College v. Russell, 499 U.S. 225, 231 (1991).

1.

Food Lion, proceeding under the proof limitations on damages, sought $2,432.35 in compensatory damages on its fraud claim and the jury awarded $1,400. According to ABC, the district court erred in upholding the verdict on this claim because Food Lion did not prove

8

injury caused by reasonable reliance on the misrepresentations made by Dale and Barnett on their job applications. We agree.

To prove fraud under North Carolina law, the plaintiff must establish that the defendant (1) made a false representation of material fact, (2) knew it was false (or made it with reckless disregard of its truth or falsity), and (3) intended that the plaintiff rely upon it. In addition, (4) the plaintiff must be injured by reasonably relying on the false representation. See Ragsdale v. Kennedy, 209 S.E.2d 494, 500 (N.C. 1974); Britt v. Britt, 359 S.E.2d 467, 471 (N.C. 1987), criticized on other grounds, Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385, 391-92 (N.C. 1988). The elements of fraud in South Carolina are essentially the same. See Florentine Corp., Inc. v. PEDA I, Inc., 339 S.E.2d 112, 113-114 (S.C. 1985). It is undisputed that Dale and Barnett knowingly made misrepresentations with the aim that Food Lion rely on them. Thus, only the fourth element of fraud, injurious reliance, is at issue. Food Lion claimed two categories of injury resulting from the lies on the job applications: the costs associated with hiring and training new employees (administrative costs) and the wages it paid to Dale and Barnett.

The main component of Food Lion's claim for fraud damages relates to administrative costs resulting from its employment of Dale and Barnett. These are routine costs associated with any new employee, including the costs of screening applications, interviewing, completing forms, and entering data into the payroll system. Also included are estimated costs attributable to trainees for lower productivity and customer dissatisfaction. Food Lion offered testimony that these costs totaled $1,944.62. It is undisputed that the jobs held by Dale and Barnett, meat wrapper trainee and deli clerk, were ones with high turnover. Still, Food Lion claims that because of the reporters' misrepresentations on their employment applications, it was forced to "incur these [administrative] costs for two more employees," Appellee's Opening Br. at 15, because the reporters quit their jobs after one or two weeks.

As indicated, under North and South Carolina law a plaintiff claiming fraud must show injury proximately caused by its reasonable reliance on a misrepresentation. See Britt, 359 S.E.2d at 471 (requiring that plaintiff be "injured by reasonably relying on the false representa-

9

tion."); <u>Florentine Corp.</u>, 339 S.E.2d at 114 (same). In this case, therefore, Food Lion had to show (1) that it hired Dale and Barnett (and incurred the administrative costs incident to their employment) because it believed they would work longer than a week or two and (2) that in forming this belief it reasonably relied on misrepresentations made by Dale and Barnett.

On their job applications Dale and Barnett did misrepresent matters such as their backgrounds, experience, and other employment. They did not, however, make any representations about how long they would work, and Food Lion did not ask for any. To the contrary, the applications signed by Dale and Barnett expressly provided that either side -- company or employee -- could terminate the employment at any time. Each application contained the same provision, written in no uncertain terms: "I also understand and agree that if employed, employment is for an indefinite period of time, and that I have the right to terminate my employment at any time for any reason, as does the Company." Food Lion also understood what this meant. As one of its payroll managers acknowledged on cross-examination, "when Food Lion hires a new deli clerk or a new meat clerk. . . it assume[s] the risk that that person might stay only a few days." Dale and Barnett were, in short, at-will employees.

Because Dale and Barnett did not make any express representations about how long they would work, Food Lion is left to contend that misrepresentations in the employment applications led it to believe the two would work for some extended period. There is a fundamental problem with that contention, however. North and South Carolina are at-will employment states, and under the at-will doctrine it is unreasonable for either the employer or the employee to rely on any assumptions about the duration of employment. At-will employment means that (absent an express agreement) employers are free to discharge employees at any time for any reason, and employees are free to quit. <u>See Kurtzman v. Applied Analytical Indus., Inc.</u>, 493 S.E.2d 420, 422 (N.C. 1997) ("in the absence of a contractual agreement between an employer and an employee establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party without regard to the quality of performance of either party"); <u>Small v. Springs Indus., Inc.</u>, 388 S.E.2d 808, 810 (S.C. 1990) ("An individual working for an employer under a contract of employ-

10

ment for an indefinite period can be terminated at will. At-will employment is generally terminable by either party at any time, for any reason or for no reason at all.") (citations omitted).

Food Lion's claim for administrative costs attributable to Dale and Barnett is simply inconsistent with the at-will employment doctrine. Under that doctrine Food Lion could not reasonably rely on the sort of misrepresentations (about background, experience, etc.) made by the reporters to conclude that they would work for any extended period. As a result, Food Lion did not show that the administrative costs were an injury caused by reasonable reliance on the misrepresentations.

Food Lion also sought to recover the full amount ($487.73) of the wages it paid to Dale and Barnett, arguing that it was fraudulently induced to pay the wages because of the misrepresentations on the reporters' employment applications. The last (proximate cause) element of fraud is again the only one at issue: Food Lion had to show that it paid the wages in reasonable reliance on the misrepresentations.

Food Lion relies on the jury's findings on a separate claim, the finding that Dale and Barnett breached their duty of loyalty to Food Lion, to argue that it proved fraud damages for the wages it paid. Specifically, Food Lion says that "it is apparent[from the disloyalty verdict] that the jury found Food Lion did not receive adequate services for the wages it paid Dale and Barnett." Appellee's Opening Br. at 14. However, proof of the breach of duty of loyalty, for which the jury awarded nominal damages of $1.00, does not equal proof of fraud damages for inadequate services. That is because it is possible to perform the assigned tasks of a job adequately and still breach the duty of loyalty. For fraud damages Food Lion still had to prove reliance on the misrepresentations.

The question is what was the proximate cause of the issuance of paychecks to Dale and Barnett. Was it the resume misrepresentations or was it something else? It was something else. Dale and Barnett were paid because they showed up for work and performed their assigned tasks as Food Lion employees. Their performance was at a level suitable to their status as new, entry-level employees. Indeed,

11

shortly before Dale quit, her supervisor said she would "make a good meat wrapper." And, when Barnett quit, her supervisor recommended that she be rehired if she sought reemployment with Food Lion in the future. In sum, Dale and Barnett were not paid their wages because of misrepresentations on their job applications. Food Lion therefore cannot assert wage payment to satisfy the injurious reliance element of fraud.[1] The fraud verdict must be reversed.[2]

_____

[1] Food Lion cannot rely on Daniel Boone Complex, Inc. v. Furst, 258 S.E.2d 379 (N.C. Ct. App. 1979), to recover administrative costs and wages as fraud damages in this case. Food Lion argues that under Daniel Boone it can recover damages if it simply proves that it was fraudulently induced to hire Dale and Barnett. That is an oversimplification. In Daniel Boone the plaintiff-borrower was induced to enter into a loan agreement based on misrepresentations about the identity of the lenders. The Court of Appeals of North Carolina said the borrower had a choice of remedies:

> Ordinarily, a party who has been fraudulently induced to enter into a contract or sale has a choice of remedies. He may repudiate the contract, and tendering back what he has received under it, may recover what he had parted with or its value; or he may affirm the contract, keeping whatever property or advantage he has derived under it, and may recover in an action for deceit the damages caused by the fraud.

Id. at 387 (citation omitted). Thus, Daniel Boone says that a party fraudulently induced to enter a contract in North Carolina has two options. He may sue for money damages, keeping whatever benefits he received under the fraudulent contract. Or, he may repudiate the contract, tender back what he received under it, and seek the value of what he parted with. The latter Daniel Boone remedy cannot apply in this case. We are dealing with employment contracts, and it is impossible for Food Lion to tender back what it received under those contracts. In other words, Dale wrapped meat and Barnett worked at the deli counter. Food Lion kept those services, and there is no way to tender them back. Because Food Lion cannot satisfy the "tender back" element of Daniel Boone's repudiation remedy, it is left with a basic fraud claim for money damages, which, as we have said, fails for lack of proof of injurious reliance.

[2] Our colleague, in partial dissent, argues that the administrative costs attributable to Dale and Barnett should be recoverable as fraud damages. To reach that result, the dissent would fundamentally alter the at-will employment doctrine by qualifying an employee's right to quit at any time. According to the dissent, Dale and Barnett induced Food Lion to

12

2.

ABC argues that Dale and Barnett cannot be held liable for a breach of duty of loyalty to Food Lion under existing tort law in North and South Carolina. It is undisputed that both reporters, on behalf of ABC, wore hidden cameras to make a video and audio record of what they saw and heard while they were employed by Food Lion. Specifically, they sought to document, for ABC's PrimeTime Live program, Food Lion employees engaging in unsanitary practices, treating products to hide spoilage, and repackaging and redating out-of-date products. The jury found that Dale and Barnett breached their duty of loyalty to Food Lion, and nominal damages of $1.00 were awarded.**3**

_____

hire them and spend money to train them by impliedly representing (as at-will job applicants) that (1) they "intend[ed] to work indefinitely, until [there was] a change in circumstances" and that (2) there was "a possibility that they would become long-term employees." Post at 30. But these implied representations that the dissent would impute are in essence representations about the potential duration of employment, and here they would translate into an obligation to work longer than a week or two. Such an obligation is inconsistent with, and cannot be enforced under, the at-will employment doctrine. Thus, when Food Lion, as an at-will employer, incurred the administrative expenses, it took the full risk that Dale and Barnett might do what any at-will employee was free to do (and what many at Food Lion did) -- quit within a very short time.

Nor can fraud damages be supported by the breach of duty of loyalty we confirm in the next subpart. The dissent argues that because Dale and Barnett (by silence) misrepresented their loyalty, Food Lion was willing to spend the money to train them on the chance they might become long-term employees. See post at 32. Missing out on that "chance" is too speculative to form a basis for damages. Even if Food Lion had spent the money on new hires who were loyal, there is no evidence that the hypothetical new hires would have stayed any longer than Dale and Barnett in these high turnover jobs. Indeed, Food Lion conceded at trial that it could not prove actual damages resulting from the breach of duty of loyalty.

**3** As we have already mentioned, Food Lion acknowledged at trial that it could not quantify actual damages on this claim. The jury was therefore instructed that it could award only nominal damages.

13

As a matter of agency law, an employee owes a duty of loyalty to her employer. In South Carolina it is "implicit in any contract for employment that the employee shall remain faithful to the employer's interest throughout the term of employment." Berry v. Goodyear Tire and Rubber Co., 242 S.E.2d 551, 552 (S.C. 1978). In North Carolina "the law implies a promise on the part of every employee to serve [her] employer faithfully." McKnight v. Simpson's Beauty Supply, Inc., 358 S.E.2d 107, 109 (N.C. Ct. App. 1987). The courts of North and South Carolina have not set out a specific test for determining when the duty of loyalty is breached. Disloyalty has been described in fairly broad terms, however. Employees are disloyal when their acts are "inconsistent with promoting the best interest of their employer at a time when they were on its payroll," Lowndes Prods., Inc. v. Brower, 191 S.E.2d 761, 767 (S.C. 1972), and an employee who "deliberately acquires an interest adverse to his employer . . . is disloyal," Long v. Vertical Techs., Inc., 439 S.E.2d 797, 802 (N.C. Ct. App. 1994).

ABC is correct to remind us that employee disloyalty issues are usually dealt with in the context of the employment contract: unfaithful employees are simply discharged, disciplined, or reprimanded. Up to now, disloyal conduct by an employee has been considered tortious in North and South Carolina in three circumstances. First, the tort of breach of duty of loyalty applies when an employee competes directly with her employer, either on her own or as an agent of a rival company. See id. at 801-02 (duty breached when employee used current employer's resources during business hours to develop rival company); Lowndes Prods., 191 S.E.2d at 767 (duty breached when employees conspired to take trade secrets and hire away other workers for the benefit of rival company they were forming). Second, the tort applies when the employee misappropriates her employer's profits, property, or business opportunities. See Sara Lee Corp. v. Carter, 500 S.E.2d 732, 736-37 (N.C. Ct. App. 1998) (duty breached when employee bought parts for employer at above market prices from company partly owned by employee); Construction Techniques, Inc. v. Dominske, 928 F.2d 632, 636-39 (4th Cir. 1991) (applying South Carolina law) (employee's ownership interest in one of his employer's suppliers was inherently adverse to interests of employer; duty of loyalty was not breached only because employee disclosed this interest to employer). Third, the tort applies when the employee breaches

14

her employer's confidences. See Lowndes Prods. , 191 S.E.2d at 767 (duty breached when employees used employer's trade secrets after forming competing business).

Because Dale and Barnett did not compete with Food Lion, misappropriate any of its profits or opportunities, or breach its confidences, ABC argues that the reporters did not engage in any disloyal conduct that is tortious under existing law. Indeed, the district court acknowledged that it was the first court to hold that the conduct in question "would be recognized by the Supreme Courts of North Carolina and South Carolina" as tortiously violating the duty of loyalty. Food Lion, Inc. v. Capital Cities/ABC, Inc., 964 F. Supp. 956, 959 n.2 (M.D.N.C. 1997). We believe the district court was correct to conclude that those courts would decide today that the reporters' conduct was sufficient to breach the duty of loyalty and trigger tort liability.

What Dale and Barnett did verges on the kind of employee activity that has already been determined to be tortious. The interests of the employer (ABC) to whom Dale and Barnett gave complete loyalty were adverse to the interests of Food Lion, the employer to whom they were unfaithful. ABC and Food Lion were not business competitors but they were adverse in a fundamental way. ABC's interest was to expose Food Lion to the public as a food chain that engaged in unsanitary and deceptive practices. Dale and Barnett served ABC's interest, at the expense of Food Lion, by engaging in the taping for ABC while they were on Food Lion's payroll. In doing this, Dale and Barnett did not serve Food Lion faithfully, and their interest (which was the same as ABC's) was diametrically opposed to Food Lion's. In these circumstances, we believe that the highest courts of North and South Carolina would hold that the reporters-- in promoting the interests of one master, ABC, to the detriment of a second, Food Lion -- committed the tort of disloyalty against Food Lion.

Our holding on this point is not a sweeping one. An employee does not commit a tort simply by holding two jobs or by performing a second job inadequately. For example, a second employer has no tort action for breach of the duty of loyalty when its employee fails to devote adequate attention or effort to her second (night shift) job because she is tired. That is because the inadequate performance is simply an incident of trying to work two jobs. There is no intent to

15

act adversely to the second employer for the benefit of the first. Cf. Long, 439 S.E.2d at 802 (finding disloyalty when employee "deliberately" acquired an interest adverse to his employer). Because Dale and Barnett had the requisite intent to act against the interests of their second employer, Food Lion, for the benefit of their main employer, ABC, they were liable in tort for their disloyalty.

We hold that, insofar as North and South Carolina law is concerned, the district court did not err in refusing to set aside the jury's verdict that Dale and Barnett breached their duty of loyalty to Food Lion.

3.

ABC argues that it was error to allow the jury to hold Dale and Barnett liable for trespass on either of the independent grounds (1) that Food Lion's consent to their presence as employees was void because it was based on misrepresentations or (2) that Food Lion's consent was vitiated when Dale and Barnett breached the duty of loyalty. The jury found Dale and Barnett liable on both of these grounds and awarded Food Lion $1.00 in nominal damages, which is all that was sought in the circumstances.

In North and South Carolina, as elsewhere, it is a trespass to enter upon another's land without consent. See, e.g. , Smith v. VonCannon, 197 S.E.2d 524, 528 (N.C. 1973); Snow v. City of Columbia, 409 S.E.2d 797, 802 (S.C. Ct. App. 1991). Accordingly, consent is a defense to a claim of trespass. See, e.g., Miller v. Brooks, 472 S.E.2d 350, 355 (N.C. Ct. App. 1996), review denied, 483 S.E.2d 172 (N.C. 1997). Even consent gained by misrepresentation is sometimes sufficient. See Desnick v. American Broad. Cos., 44 F.3d 1345, 1351-52 (7th Cir. 1995) (Posner, C.J.). The consent to enter is canceled out, however, "if a wrongful act is done in excess of and in abuse of authorized entry." Miller, 472 S.E.2d at 355 (citing Blackwood v. Cates, 254 S.E.2d 7, 9 (N.C. 1979)). Cf. Ravan v. Greenville County, 434 S.E.2d 296, 306 (S.C. Ct. App. 1993) (noting that the law of trespass protects the "peaceable possession" of property).

We turn first to whether Dale and Barnett's consent to be in nonpublic areas of Food Lion property was void from the outset because

16

of the resume misrepresentations. "[C]onsent to an entry is often given legal effect" even though it was obtained by misrepresentation or concealed intentions. Desnick, 44 F.3d at 1351. Without this result,

> a restaurant critic could not conceal his identity when he ordered a meal, or a browser pretend to be interested in merchandise that he could not afford to buy. Dinner guests would be trespassers if they were false friends who never would have been invited had the host known their true character, and a consumer who in an effort to bargain down an automobile dealer falsely claimed to be able to buy the same car elsewhere at a lower price would be a trespasser in a dealer's showroom.

Id.

Of course, many cases on the spectrum become much harder than these examples, and the courts of North and South Carolina have not considered the validity of a consent to enter land obtained by misrepresentation. Further, the various jurisdictions and authorities in this country are not of one mind in dealing with the issue. Compare Restatement (Second) of Torts, § 892B(2) (1965) ("[i]f the person consenting to the conduct of another . . . is induced [to consent] by the other's misrepresentation, the consent is not effective for the unexpected invasion or harm") and Shiffman v. Empire Blue Cross and Blue Shield, 681 N.Y.S.2d 511, 512 (App. Div. 1998) (reporter who gained entry to medical office by posing as potential patient using false identification and insurance cards could not assert consent as defense to trespass claim "since consent obtained by misrepresentation or fraud is invalid"), with Desnick, 44 F.3d at 1351-53 (ABC agents with concealed cameras who obtained consent to enter an ophthalmic clinic by pretending to be patients were not trespassers because, among other things, they "entered offices open to anyone"); Baugh v. CBS, Inc., 828 F. Supp. 745, 757 (N.D. Cal. 1993) ("where consent was fraudulently induced, but consent was nonetheless given, plaintiff has no claim for trespass"); and Martin v. Fidelity & Cas. Co. of New York, 421 So.2d 109, 111 (Ala. 1982) (consent to enter is valid "even though consent may have been given under a mistake of facts, or procured by fraud") (citation omitted).

17

We like Desnick's thoughtful analysis about when a consent to enter that is based on misrepresentation may be given effect. In Desnick ABC sent persons posing as patients needing eye care to the plaintiffs' eye clinics, and the test patients secretly recorded their examinations. Some of the recordings were used in a PrimeTime Live segment that alleged intentional misdiagnosis and unnecessary cataract surgery. Desnick held that although the test patients misrepresented their purpose, their consent to enter was still valid because they did not invade "any of the specific interests[relating to peaceable possession of land] the tort of trespass seeks to protect:" the test patients entered offices "open to anyone expressing a desire for ophthalmic services" and videotaped doctors engaged in professional discussions with strangers, the testers; the testers did not disrupt the offices or invade anyone's private space; and the testers did not reveal the "intimate details of anybody's life." 44 F.3d at 1352-53. Desnick supported its conclusion with the following comparison:

> "Testers" who pose as prospective home buyers in order to gather evidence of housing discrimination are not trespassers even if they are private persons not acting under color of law. The situation of [ABC's] "testers" is analogous. Like testers seeking evidence of violation of anti-discrimination laws, [ABC's] test patients gained entry into the plaintiffs' premises by misrepresenting their purposes (more precisely by a misleading omission to disclose those purposes). But the entry was not invasive in the sense of infringing the kind of interest of the plaintiffs that the law of trespass protects; it was not an interference with the ownership or possession of land.

Id. at 1353 (citation omitted).**4**

We return to the jury's first trespass finding in this case, which rested on a narrow ground. The jury found that Dale and Barnett were trespassers because they entered Food Lion's premises as employees with consent given because of the misrepresentations in their job applications. Although the consent cases as a class are inconsistent,

_____

**4 Desnick** noted in a separate discussion that the test patients were not sent in to commit a tort or some other injurious act. 44 F.3d at 1353.

18

we have not found any case suggesting that consent based on a resume misrepresentation turns a successful job applicant into a trespasser the moment she enters the employer's premises to begin work. Moreover, if we turned successful resume fraud into trespass, we would not be protecting the interest underlying the tort of trespass -- the ownership and peaceable possession of land. See Desnick, 44 F.2d at 1352; see generally Matthews v. Forrest, 69 S.E.2d 553, 555 (N.C. 1952); Ravan, 434 S.E.2d at 306. Accordingly, we cannot say that North and South Carolina's highest courts would hold that misrepresentation on a job application alone nullifies the consent given to an employee to enter the employer's property, thereby turning the employee into a trespasser. The jury's finding of trespass therefore cannot be sustained on the grounds of resume misrepresentation.

There is a problem, however, with what Dale and Barnett did after they entered Food Lion's property. The jury also found that the reporters committed trespass by breaching their duty of loyalty to Food Lion "as a result of pursuing [their] investigation for ABC." We affirm the finding of trespass on this ground because the breach of duty of loyalty -- triggered by the filming in non-public areas, which was adverse to Food Lion -- was a wrongful act in excess of Dale and Barnett's authority to enter Food Lion's premises as employees. See generally Blackwood, 254 S.E.2d at 9 (finding liability for trespass when activity on property exceeded scope of consent to enter).

The Court of Appeals of North Carolina has indicated that secretly installing a video camera in someone's private home can be a wrongful act in excess of consent given to enter. In the trespass case of Miller v. Brooks the (defendant) wife, who claimed she had consent to enter her estranged husband's (the plaintiff's) house, had a private detective place a video camera in the ceiling of her husband's bedroom. The court noted that "[e]ven an authorized entry can be trespass if a wrongful act is done in excess of and in abuse of authorized entry." Miller, 472 S.E.2d at 355. The court went on to hold that "[e]ven if [the wife] had permission to enter the house and to authorize others to do so," it was a jury question "whether defendants' entries exceeded the scope of any permission given." Id. We recognize that Miller involved a private home, not a grocery store, and that it involved some physical alteration to the plaintiff's property (installation of a camera). Still, we believe the general principle is applica-

19

ble here, at least in the case of Dale, who worked in a Food Lion store in North Carolina. Although Food Lion consented to Dale's entry to do her job, she exceeded that consent when she videotaped in non-public areas of the store and worked against the interests of her second employer, Food Lion, in doing so.

We do not have a case comparable to Miller from South Carolina. Nevertheless, the South Carolina courts make clear that the law of trespass protects the peaceable enjoyment of property. See Ravan, 434 S.E.2d at 306. It is consistent with that principle to hold that consent to enter is vitiated by a wrongful act that exceeds and abuses the privilege of entry.

Here, both Dale and Barnett became employees of Food Lion with the certain consequence that they would breach their implied promises to serve Food Lion faithfully. They went into areas of the stores that were not open to the public and secretly videotaped, an act that was directly adverse to the interests of their second employer, Food Lion. Thus, they breached the duty of loyalty, thereby committing a wrongful act in abuse of their authority to be on Food Lion's property.

In sum, we are convinced that the highest courts of North and South Carolina would hold that Dale and Barnett committed trespass because Food Lion's consent for them to be on its property was nullified when they tortiously breached their duty of loyalty to Food Lion. Accordingly, as far as North and South Carolina law is concerned, the jury's trespass verdict should be sustained.

4.

Dale worked in a Food Lion store in North Carolina. Based on the jury's finding of fraud and a special interrogatory, the district court determined that ABC and Dale were liable under the North Carolina UTPA, N.C. Gen. Stat. § 75-1.1. Because Food Lion elected to take damages on the fraud claim, the district court awarded no damages on the UTPA claim. ABC argues that the Act does not apply to the circumstances of this case, and we agree.

20

North Carolina's UTPA prohibits "[u]nfair methods of competition" and "unfair or deceptive acts or practices" that are "in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a)."Commerce" is defined to include "all business activities, however denominated." N.C. Gen. Stat. § 75-1.1(b). Food Lion contends that Dale's misrepresentations on her job application were "deceptive acts""in or affecting commerce" because they were made to further the production of PrimeTime Live, a business activity.

Although the UTPA's language is quite broad, "the Act is not intended to apply to all wrongs in a business setting." HAJMM Co. v. House of Raeford Farms, Inc., 403 S.E.2d 483, 492 (N.C. 1991). The Act's primary purpose is to protect the consuming public. See Skinner v. E.F. Hutton & Co., Inc., 333 S.E.2d 236, 241 (N.C. 1985). It gives a private cause of action to consumers aggrieved by unfair or deceptive business practices. See Marshall v. Miller, 276 S.E.2d 397, 400 (N.C. 1981). In addition, businesses are sometimes allowed to assert UTPA claims against other businesses because"unfair trade practices involving only businesses" can "affect the consumer as well." United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 389 (N.C. 1988). But one business is permitted to assert an UTPA claim against another business only when the businesses are competitors (or potential competitors) or are engaged in commercial dealings with each other. See, e.g., Winston Realty Co. v. G.H.G., Inc., 331 S.E.2d 677 (N.C. 1985) (UTPA applies when temporary personnel agency falsely claims to have conducted background checks of workers it sends to companies); Harrington Mfg. Co. v. Powell Mfg. Co., 248 S.E.2d 739 (N.C. Ct. App. 1979) (UTPA applies when manufacturer passes off its competitor's goods as those of its own); Concrete Serv. Corp. v. Investors Group, Inc., 340 S.E.2d 755, 760-61 (N.C. Ct. App. 1986) (UTPA covers acts intended to deceive suppliers into extending credit). In any event, the fundamental purpose of the UTPA is to protect the consumer, and courts invariably look to that purpose in deciding whether the Act applies. See Lindner v. Durham Hosiery Mills, Inc., 761 F.2d 162, 165-67 (4th Cir. 1985).

The district court found an UTPA violation because ABC is a business that engaged in deception. However, the deception -- the misrepresentations in Dale's application -- did not harm the consuming public. Presumably, ABC intended to benefit the consuming public by

21

letting it know about Food Lion's food handling practices. Moreover, ABC was not competing with Food Lion, and it did not have any actual or potential business relationship with the grocery chain. The UTPA, therefore, cannot be used here because there is no competitive or business relationship that can be policed for the benefit of the consuming public. The North Carolina statute has not been applied to a circumstance like this, and we believe the Supreme Court of North Carolina would hold that it should not be. We therefore reverse the district court's judgment that the ABC defendants, including Dale, were liable under the North Carolina UTPA.

B.

ABC argues that even if state tort law covers some of Dale and Barnett's conduct, the district court erred in refusing to subject Food Lion's claims to any level of First Amendment scrutiny. ABC makes this argument because Dale and Barnett were engaged in newsgathering for PrimeTime Live. It is true that there are "First Amendment interests in newsgathering." In re Shain, 978 F.2d 850, 855 (4th Cir. 1992) (Wilkinson J., concurring). See also Branzburg v. Hayes, 408 U.S. 665, 681 (1972) ("without some protection for seeking out the news, freedom of the press could be eviscerated."). However, the Supreme Court has said in no uncertain terms that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991); see also Desnick, 44 F.3d at 1355 ("the media have no general immunity from tort or contract liability").

In Cowles, Cohen, who was associated with a candidate for governor of Minnesota, gave damaging information about a candidate for another office to two reporters on their promise that his (Cohen's) identity would not be disclosed. Because editors at the reporters' newspapers concluded that the source was an essential part of the story, it was published with Cohen named as the origin. Cohen was fired from his job as a result, and he sued the newspapers for breaking the promise. The question in the Supreme Court was whether the First Amendment barred Cohen from recovering damages under state promissory estoppel law. The newspapers argued that absent "a need to further a state interest of the highest order," the First Amendment

22

protected them from liability for publishing truthful information, lawfully obtained, about a matter of public concern. Id. at 668-69 (quoting Smith v. Daily Mail Publ'g Co., 443 U.S. 97, 103 (1979)). The Supreme Court disagreed, holding that the press "has no special immunity from the application of general laws" and that the enforcement of general laws against the press "is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." Id. at 670 (quoting Associated Press v. NLRB, 301 U.S. 103, 132 (1937)).

The key inquiry in Cowles was whether the law of promissory estoppel was a generally applicable law. The Court began its analysis with some examples of generally applicable laws that must be obeyed by the press, such as those relating to copyright, labor, antitrust, and tax. Id. at 669. More relevant to us, "[t]he press may not with impunity break and enter an office or dwelling to gather news." Id. In analyzing the doctrine of promissory estoppel, the Court determined that it was a law of general applicability because it "does not target or single out the press," but instead applies "to the daily transactions of all the citizens of Minnesota." Id. at 670. The Court concluded that "the First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law." Id. at 672. The Court thus refused to apply any heightened scrutiny to the enforcement of Minnesota's promissory estoppel law against the newspapers.

The torts Dale and Barnett committed, breach of the duty of loyalty and trespass, fit neatly into the Cowles framework. Neither tort targets or singles out the press. Each applies to the daily transactions of the citizens of North and South Carolina. If, for example, an employee of a competing grocery chain hired on with Food Lion and videotaped damaging information in Food Lion's non-public areas for later disclosure to the public, these tort laws would apply with the same force as they do against Dale and Barnett here. Nor do we believe that applying these laws against the media will have more than an "incidental effect" on newsgathering. See Cowles , 501 U.S. at 669, 671-72. We are convinced that the media can do its important job effectively without resort to the commission of run-of-the-mill torts.**5**

_____
**5** Indeed, the ABC News Policy Manual states that "news gathering of whatever sort does not include any license to violate the law."

ABC argues that Cowles is not to be applied automatically to every "generally applicable law" because the Supreme Court has since said that "the enforcement of [such a] law may or may not be subject to heightened scrutiny under the First Amendment." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 640 (1994) (contrasting Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991), and Cowles). In Glen Theatre nude dancing establishments and their dancers challenged a generally applicable law prohibiting public nudity. Because the general ban on public nudity covered nude dancing, which was expressive conduct, the Supreme Court applied heightened scrutiny. Glen Theatre, 501 U.S. at 566. In Cowles a generally applicable law (promissory estoppel) was invoked against newspapers who broke their promises to a source that they would keep his name confidential in exchange for information leading to a news story. There, the Court refused to apply heightened scrutiny, concluding that application of the doctrine of promissory estoppel had "no more than [an] incidental" effect on the press's ability to gather or report news. Cowles , 501 U.S. at 671-72. There is arguable tension between the approaches in the two cases. The cases are consistent, however, if we view the challenged conduct in Cowles to be the breach of promise and not some form of expression. In Glen Theatre, on the other hand, an activity directly covered by the law, nude dancing, necessarily involved expression, and heightened scrutiny was applied. Here, as in Cowles, heightened scrutiny does not apply because the tort laws (breach of duty of loyalty and trespass) do not single out the press or have more than an incidental effect upon its work.

C.

For the foregoing reasons, we affirm the judgment that Dale and Barnett breached their duty of loyalty to Food Lion and committed trespass. We likewise affirm the damages award against them for these torts in the amount of $2.00. We have already indicated that the fraud claim against all of the ABC defendants must be reversed. Because Food Lion was awarded punitive damages only on its fraud claim, the judgment awarding punitive damages cannot stand.

III.

In its cross-appeal Food Lion argues that the district court erred in refusing to allow it to use its non-reputational tort claims (breach of

24

duty of loyalty, trespass, etc.) to recover compensatory damages for ABC's broadcast of the PrimeTime Live program that targeted Food Lion. The publication damages Food Lion sought (or alleged) were for items relating to its reputation, such as loss of good will and lost sales. The district court determined that the publication damages claimed by Food Lion "were the direct result of diminished consumer confidence in the store" and that "it was[Food Lion's] food handling practices themselves -- not the method by which they were recorded or published -- which caused the loss of consumer confidence." Food Lion, Inc. v. Capital Cities/ABC, Inc., 964 F. Supp. 956, 963 (M.D.N.C. 1997). The court therefore concluded that the publication damages were not proximately caused by the non-reputational torts committed by ABC's employees. We do not reach the matter of proximate cause because an overriding (and settled) First Amendment principle precludes the award of publication damages in this case, as ABC has argued to the district court and to us. Food Lion attempted to avoid the First Amendment limitations on defamation claims by seeking publication damages under non-reputational tort claims, while holding to the normal state law proof standards for these torts. This is precluded by Hustler Magazine v. Falwell, 485 U.S. 46 (1988).

Food Lion acknowledges that it did not sue for defamation because its "ability to bring an action for defamation . . . required proof that ABC acted with actual malice." Appellee's Opening Br. at 44. Food Lion thus understood that if it sued ABC for defamation it would have to prove that the PrimeTime Live broadcast contained a false statement of fact that was made with "actual malice," that is, with knowledge that it was false or with reckless disregard as to whether it was true or false. See New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964). It is clear that Food Lion was not prepared to offer proof meeting the New York Times standard under any claim that it might assert. What Food Lion sought to do, then, was to recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim. We believe that such an end-run around First Amendment strictures is foreclosed by Hustler.

In Hustler a popular liquor advertisement prompted the magazine to run a parody of the ad, labeled as such, that featured the Reverend Jerry Falwell "discussing" an incestuous sexual act he had undertaken

25

while drunk in disgusting circumstances. Falwell sued the magazine and its publisher, Larry Flynt, seeking damages for libel and intentional infliction of emotional distress. At trial the jury held against Falwell on the libel claim, specifically finding that the ad parody could not reasonably be understood as describing actual facts about Falwell or actual events in which he participated. The jury, however, found for Falwell on the emotional distress claim and awarded compensatory and punitive damages.

It was clear that Falwell, in asserting the claim for intentional infliction of emotional distress, sought "damages for emotional harm caused by the publication of an ad parody offensive to him." Hustler, 485 U.S. at 50 (emphasis added). In the Supreme Court the question was whether Falwell had to satisfy the heightened First Amendment proof standard set forth in New York Times. After concluding that the ad parody was protected expression, the Court, in an opinion by Chief Justice Rehnquist, held that the constitutional libel standard applied to Falwell's emotional distress claim:

> We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with"actual malice," i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true.

Hustler, 485 U.S. at 56.

Hustler confirms that when a public figure plaintiff uses a law to seek damages resulting from speech covered by the First Amendment, the plaintiff must satisfy the proof standard of New York Times. Here, Food Lion was not prepared to meet this standard for publication damages under any of the claims it asserted. Unless there is some way to distinguish Hustler (we think there is not, see below), Food Lion cannot sustain its request for publication damages from the ABC broadcast.

Food Lion argues that Cowles, supra, and not Hustler governs its claim for publication damages. According to Food Lion, Cowles

26

allowed the plaintiff to recover -- without satisfying the constitutional prerequisites to a defamation action -- economic losses for publishing the plaintiff's identity in violation of a legal duty arising from generally applicable law. Food Lion says that its claim for damages is like the plaintiff's in Cowles, and not like Falwell's in Hustler. This argument fails because the Court in Cowles distinguished the damages sought there from those in Hustler in a way that also distinguishes Food Lion's case from Cowles:

> Cohen is not seeking damages for injury to his reputation or his state of mind. He sought damages . . . for breach of a promise that caused him to lose his job and lowered his earning capacity. Thus, this is not a case like Hustler . . . where we held that the constitutional libel standards apply to a claim alleging that the publication of a parody was a state-law tort of intentional infliction of emotional distress.

Cowles, 501 U.S. at 671. Food Lion, in seeking compensation for matters such as loss of good will and lost sales, is claiming reputational damages from publication, which the Cowles Court distinguished by placing them in the same category as the emotional distress damages sought by Falwell in Hustler . In other words, according to Cowles, "constitutional libel standards" apply to damage claims for reputational injury from a publication such as the one here.

Food Lion also argues that because ABC obtained the videotapes through unlawful acts, that is, the torts of breach of duty of loyalty and trespass, it (Food Lion) is entitled to publication damages without meeting the New York Times standard. The Supreme Court has never suggested that it would dispense with the Times standard in this situation, and we believe Hustler indicates that the Court would not. In Hustler the magazine's conduct would have been sufficient to constitute an unlawful act, the intentional infliction of emotional distress, if state law standards of proof had applied. Indeed, the Court said, "[g]enerally speaking the law does not regard the intent to inflict emotional distress as one which should receive much solicitude." Hustler, 485 U.S. at 53. Notwithstanding the nature of the underlying act, the Court held that satisfying New York Times was a prerequisite to the recovery of publication damages. That result was"necessary," the

27

Court concluded, in order "to give adequate `breathing space' to the freedoms protected by the First Amendment." Id. at 56.

In sum, Food Lion could not bypass the New York Times standard if it wanted publication damages. The district court therefore reached the correct result when it disallowed these damages, although we affirm on a different ground.

IV.

To recap, we reverse the judgment to the extent it provides that the ABC defendants committed fraud and awards compensatory damages of $1,400 and punitive damages of $315,000 on that claim; we affirm the judgment to the extent it provides that Dale and Barnett breached their duty of loyalty to Food Lion and committed a trespass and awards total damages of $2.00 on those claims; we reverse the judgment to the extent it provides that the ABC defendants violated the North Carolina UTPA; and we affirm the district court's ruling that Food Lion was not entitled to prove publication damages on its claims.

AFFIRMED IN PART AND REVERSED IN PART

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

Because I believe that ample evidence supports the jury's verdict finding that the ABC defendants acted fraudulently, I dissent from Part II.A.1. of the majority opinion. I am pleased to join the remainder.

I

The transactional facts are not disputed. In order to obtain an inside story, ABC's PrimeTime Live devised a plan by which ABC's employees would falsely represent themselves to Food Lion to obtain jobs in its stores and then would secretly film the activities of Food Lion's employees, including themselves, using miniature "spy cam" equipment.

28

In applying for jobs at Food Lion stores, ABC reporters Lynne Dale and Susan Barnett misrepresented themselves, their experience, and their references, even though they certified that their applications were complete and truthful. More fundamentally, they misrepresented themselves as bona fide applicants for employment. They were already employees of ABC and knew that within a week or two they would no longer be working for Food Lion. After Food Lion gave them jobs at stores in North Carolina and South Carolina, Dale and Barnett roamed the stores to obtain film footage for PrimeTime Live. While some of the film footage so obtained was damaging to Food Lion, these reporters contributed to the damage. For example, when Barnett saw food that she suspected to be out of date, she sold it to her camera crew rather than throw it away. Similarly, she attempted to sell such food to a customer. When these reporters obtained their film footage -- after two weeks for Barnett and one week for Dale -- they quit their jobs at Food Lion and provided the videotapes to ABC's PrimeTime Live for broadcast on national television.

The jury returned a verdict against the ABC defendants based on fraud and awarded Food Lion $1,400 in compensatory damages and over $5.5 million in punitive damages. The district court remitted the $5.5 million punitive damage award to $315,000. I would affirm this judgment.

II

The elements of a fraud claim under North Carolina law are "(1) [a] [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385, 391 (N.C. 1988) (emphasis omitted) (quoting Ragsdale v. Kennedy, 209 S.E.2d 494, 500 (N.C. 1974)). The requirements under South Carolina law are similar. See Florentine Corp. v. PEDA I, Inc., 339 S.E.2d 112, 113-14 (S.C. 1985).

In reversing the jury's fraud verdict, the majority agrees with the ABC defendants that Food Lion failed to prove the injury element of its fraud claim because the expenses it incurred in training at-will employees could not be claimed as damages. The majority explains,

29

"North and South Carolina are at-will employment states, and under the at-will doctrine it is unreasonable for either the employer or the employee to rely on any assumptions about the duration of employment." Ante, at 10.

I respectfully disagree, and my disagreement focuses on (1) the difference in hiring a person who intends to work indefinitely and a person who intends to work one or two weeks and fails to disclose that intent, and (2) the ABC employees' misrepresentation of loyalty inherent in their application for a job. I will discuss these in order.

A

The majority concludes that there is no difference in Food Lion's unwitting employment of ABC reporters who intend to leave within one or two weeks and employment of applicants who have no specific intent about the duration of their employment because both types of the employment are "at will." This, however, overlooks the difference between a bona fide at-will employee and an undercover news reporter who knows from the beginning that she will stay only two weeks. With the former, normal risks allow for the possibility that Food Lion can obtain long-term, experienced, faithful service from which it can recover its training expenses; with the latter there is no such possibility.

Applicants for employment, even at-will employment, present themselves representing by implication: (1) that they want to become employees; (2) that they intend to work indefinitely, until a change in circumstances leads them or their employer to terminate the arrangement; (3) that there is a possibility that they would become long-term employees; and (4) that they will be loyal employees as long as they work, prepared to work at the promotion of their employer's business. ABC's undercover reporters presented themselves to Food Lion, representing all of these matters falsely. They did not, during the application process, disclose that they did not intend to become employees at all. Indeed, they were already employed by ABC, and their application for employment with Food Lion was only a sham to get them into locations within Food Lion where they otherwise would not be permitted. Moreover, the ABC employees had no intention of allowing the normal risks of at-will employment to govern their term; they

30

knew from the beginning that they were to be at Food Lion only long enough to obtain damaging information.

In training new employees and investing in their future, Food Lion has a right to assume that the normal risks attend the relationship and that some of those employees will eventually become experienced and loyal employees who will provide a return on the costs of training them. The fact that Food Lion would not make such an investment in an applicant if the applicant stated that she was an ABC employee only seeking inside information and that she would leave after two weeks defines the injury sustained by Food Lion. Indeed, far less injury is required by law. Where a plaintiff presents evidence that the defendant's fraudulent misrepresentation induced the plaintiff to deal "with a party with whom it did not wish to deal," "sufficient injury" has been shown "to meet the requisite damage element of fraud" and the plaintiff is "entitled to recover any damages shown to result there-from." Daniel Boone Complex, Inc. v. Furst , 258 S.E.2d 379, 386-87 (N.C. Ct. App. 1979). Not only was Food Lion induced to hire persons it would not otherwise have hired, it was induced to spend money on persons whose potential for employment was nil, contrary to the potential of a bona fide applicant for at-will employment.

B

Similarly and perhaps more importantly, Dale and Barnett's implied representations that they would be loyal Food Lion employees injured Food Lion. Both North Carolina and South Carolina law provide that implicit in any contract for employment is the duty of the employee to "remain faithful to the employer's interest throughout the term of employment." Berry v. Goodyear Tire & Rubber Co., 242 S.E.2d 551, 552 (S.C. 1978); see also McKnight v. Simpson's Beauty Supply, Inc. 358 S.E.2d 107, 109 (N.C. Ct. App. 1987) ("[T]he law implies a promise on the part of every employee to serve his employer faithfully"). And when an employee acts adversely to the interest of his employer, he is disloyal and his discharge is justified. Berry, 242 S.E.2d at 552.

In this case, Dale and Barnett never intended to work as loyal employees for Food Lion and to promote the business of Food Lion. On the contrary, they applied to Food Lion with the secret intent to

31

obtain sensational and damaging evidence to publish against Food Lion. And in furtherance of that purpose they even failed to do what they were hired to do. As one snippet from their videotape shows, instead of cleaning a meat grinder that a loyal employee would have undertaken to clean, even if the task were not specifically assigned to the employee, the ABC employee photographed the dirty meat grinder and offered it as an example of poor food-handling practices. Moreover, in seeking to "uncover" practices, the ABC employees baited fellow employees to say and do things that they knew would undermine Food Lion's standing food-handling practices. Indeed, a portion of the majority opinion, which I have joined, concludes that these employees breached their duties of loyalty to Food Lion and, in doing so, caused Food Lion damage. I believe that this very breach and injury, when intended from the very beginning, also supports Food Lion's fraud claim.

III

In short, the ABC employees misrepresented their potential for staying at Food Lion and they misrepresented their loyalty. Food Lion had less of a chance -- indeed, no chance -- of developing experienced, long-term, and loyal employees because the likelihood of that possibility was misrepresented. If these ABC employees had disclosed their true identities and intentions accurately, Food Lion would never have hired them and incurred expenses to train them on the chance that they would stay because the employees had already determined there was no such chance.

In my judgment, the jury had ample evidence to reach the conclusion that the ABC defendants committed common law fraud, and I would affirm its verdict.

32