**VIRGINIA IMPORTS, INC., Plaintiff,**

v.

**KIRIN BREWERY OF AMERICA, LLC, Defendant.**

No. CIV. 03–928–A.

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 8, 2003.

George E. Kostel, Esquire, Reed Smith, LLP, Richmond, VA, for Plaintiff.

Warwick Rex Furr, II, Esquire, Holland and Knight, McLean, VA, for Defendant.

### MEMORANDUM OPINION

CACHERIS, District Judge.

Plaintiff brings this action to recover on claims of fraud and constructive fraud. It alleges that the Defendant committed fraud or constructive fraud in its policies and actions during its termination of the agreement between the parties under Virginia's Beer Franchise Act. Defendant moves to dismiss this action or in the alternative for summary judgment. The Court holds the following: (1) the Plaintiff's cause of action is not preempted by the Beer Franchise Act; and, (2) the action is barred by Virginia's statute of limitation for fraud actions.

### I. Background

*A. Factual Background*

Plaintiff Virginia Imports ("VI") is a Virginia corporation and a state-licensed beer and wine distributor. Defendant Kirin Brewery of America LLC ("Kirin") is a Delaware limited liability company, with its principal place of business in Santa Monica, California. Kirin's parent company is a Japanese brewery. The following background information is drawn from an opinion by Judge Roush of the Circuit Court of Virginia, Fairfax County, which sets forth the relevant facts. *See Kirin Brewery of America, LLC v. Virginia Imports Ltd.*, 2002 WL 31188497, *1–3 (Va. Cir. Ct.2002). Virginia's Beer Franchise Act (the "BFA") regulates the business relationships between beer manufacturers and local beer wholesalers. The BFA governs sales territories, distributorship contracts, the performance of distribution agreements, and the amendment or termination of such agreements. The BFA de-

fines an agreement as "a commercial relationship not required to be evidenced in writing of definite or indefinite duration between a brewery and a beer wholesaler pursuant to which the wholesaler has been authorized to distribute one or more of the brewery's brands of beer." Va.Code Ann. § 4.1–500.

Since 1979, Kirin and VI have had an "agreement" under the BFA. Under the agreement, VI held the exclusive rights to distribute certain Kirin products in licensed retail establishments in northern Virginia. Both parties performed the agreement for close to 20 years without any apparent problems.

In 1996, Kirin formed a strategic alliance with Anheuser–Busch, Inc.("AB") to make and sell Kirin Brewery's beers in the United States. *See Financial Digest,* Wash. Post, June 6, 1996, at D9. Shortly thereafter, Kirin announced its intention to transfer the rights to distribute Kirin products from its existing distributors, like VI, to distributors that were part of the existing AB network. (Compl.¶ 9.)

In 1999, Kirin made a series of monetary offers to VI to buy out the agreement between the parties, thereby allowing Kirin to transfer the rights to AB. VI rejected these offers.

Only days after VI rejected Kirin's final offer, Kirin began complaining about VI's performance of the Agreement. VI alleges that Kirin "concocted a ruse to make Kirin's termination of VI appear to comply with the Franchise Act, and embarked upon a campaign to build an artificial record of 'non-performance' in order to justify the termination." (Compl.¶ 12.) Thirty days after Kirin's final offer was refused, Kirin informed VI that it had a "freshness policy." This policy required that VI remove from store shelves all Kirin products over 180 days past their "born-on-date." VI maintains that the "freshness policy" was merely a pretext to impose impossible

conditions upon VI and to provide an excuse for statutory termination. At the same time, Kirin maintained a 270–day freshness policy for its beer in Japan.

In April 1999, Kirin demanded that VI comply with the freshness policy by May 1. After discussions, the parties agreed that the time limit was too short. Kirin allotted VI 120 days to comply with the freshness policy. However, on August 3, 1999—nearly four weeks prior to the date set by the parties—Kirin sent VI the statutorily required notice of its intent to terminate the agreement. *See* Va.Code Ann. 4.1–506. Kirin described several grounds for the termination, including VI's failure to remove out-of-code beer (i.e. beer 180 days past its "born on date") from the shelves. Kirin complied with Code § 4.1–506(A) by sending a copy of the termination letter to the Alcoholic Beverage Control Board ("ABCB" of "the Board").

VI sent a cure letter to Kirin, on October 4, 1999, asserting that it had corrected the problems cited in the termination letter. However, VI did not notify the Board that it was attempting to cure the deficiencies Kirin identified as the BFA required. *See* Va.Code § 4.1–506(B) ("[a] copy of the notice shall be mailed at the same time to the Board.").

On October 22, 1999, having received VI's cure letter, Kirin requested a hearing before the Board pursuant to Code § 4.1–506(D) on the issue of whether VI had cured the deficiencies and whether Kirin had "good cause" to terminate the distributorship. In its October 22, 1999 letter, Kirin expressed its continued dissatisfaction with "out-of-code beer and ... [VI's] poor service." *See Kirin,* 2002 WL 31188497, at *1.

The Secretary of the Board (the "Secretary"), by letter of February 9, 2000, wrote Kirin as follows:

Our records indicate that by letter dated August 3, 1999, your company gave notice to VI, Ltd., of your intent to terminate your agreement designating VI, Ltd., as the wholesale distributor of Kirin brands in certain territories in Virginia. More than ninety days have now passed since that notice, and we have received neither a notice from the wholesaler that it has taken action to rectify the conditions constituting the reason for the termination, nor a request for a hearing on the issue of reasonable cause. Therefore, under the provisions of the Beer Franchise Act, the agreement between Kirin and VI, Ltd., was effectively terminated ninety days after the August 3, 1999, notice.

Kirin is free to appoint other distributors for the territories formerly held by VI, Ltd.

(Def.Mem.Ex. A.) Kirin wrote to the Secretary on February 10, 2000, designating AB as Kirin's distributor for Virginia.

The Secretary denied VI's request that he temporarily suspend the effectiveness of his February 9, 2000 letter. Similarly, the Board refused to reinstate the distributorship agreement between Kirin. *Kirin*, 2002 WL 31188497, at *2.

### B. Procedural History

In February 2000, VI protested the Secretary's actions. On April 17, 2000, the Secretary referred the matter for a hearing. The hearing panel found that the primary reason advanced by Kirin for its termination of the agreement was VI's failure to comply with Kirin's freshness policy. *Id.* The hearing panel concluded that a freshness policy could be reasonable, but Kirin had enforced their in an unreasonable manner. The hearing panel, therefore, concluded that Kirin failed to prove that it imposed a "reasonable and material requirement" on the wholesaler as required by Code § 4.1–505 and that "good

cause" existed for its termination of the agreement. The hearing panel held that, even if Kirin's freshness policy were reasonable, VI had substantially complied with the policy. The hearing panel concluded that Kirin acted in bad faith in terminating the agreement because, *inter alia*, Kirin only began visiting retail accounts and finding out-of-code beer after VI repeatedly refused Kirin's offers to purchase the distribution rights for Kirin beer. The hearing panel reasoned that a brewery cannot have good cause for termination in the absence of good faith.

Both parties appealed the hearing panel's decision to the Board. On September 26, 2001, the Board issued its Final Order. The Board overruled the hearing panel's decision in part, finding that Kirin had instituted a reasonable freshness policy for its products and noting that:

The hearing panel appears to adopt a theory that a brewery terminating a franchise agreement is guilty of bad faith under the Beer Franchise Act if it possesses a motive which does not amount to good cause for termination under the Act, even if it has made reasonable and material requirements with which the wholesaler has not substantially complied. The Board does not adopt this interpretation of the Act's requirements.

(Def. Mem. Ex. E at 3.) The Board found that VI substantially complied with Kirin's freshness policy and that Kirin lacked good cause to terminate VI. The Board further found Kirin guilty of bad faith "in proceeding to terminate its agreement with VI in February, 2000, even though it was on notice that VI had claimed to have taken corrective action with respect to all the causes for termination." (*Id.*) As a remedy, the Board ordered Kirin to pay VI's reasonable costs and attorney's fees. (*Id.*)

Kirin appealed the Board's order to the Circuit Court of Virginia. *See Kirin,* 2002 WL 31188497. Judge Roush overturned the Board's ruling, holding that the Board erred in concluding that Kirin acted in bad faith and that it "reasonably relied upon an official communication from the Secretary of the Board." *Id.* at *7.

VI filed this case on June 5, 2002. VI alleged that Kirin committed actual and constructive fraud upon both VI and the Board. (Compl.¶ 30.) On July 21, 2003, Kirin removed the case from state court. On September 10, Kirin moved for judgment on the pleadings, or in the alternative for summary judgment. The Court heard oral argument on October 31, 2003 and took the matter under advisement. This motion is currently before the Court.

## II. Standard of Review

Pursuant to Rule 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial." Fed. R.Civ.P. 12(c). The pleadings are considered closed "upon the filing of a complaint and answer." 5A C. Wright & A. Miller, Federal Practice & Procedure § 1367 (West 1990) (citing Fed.R.Civ.P. 7(a)) (footnotes omitted). As previously explained by this Court, "[a] Rule 12(c) motion ... is appropriate when all material allegations of fact are admitted in the pleadings and only questions of law remain." *Republic Ins. Co. v. Culbertson,* 717 F.Supp. 415, 418 (E.D.Va.1989) (Cacheris, J.) (citing *King v. Gemini Food Servs., Inc.,* 438 F.Supp. 964, 966 (E.D.Va. 1976) (judgment on pleadings appropriate when viewed in light most favorable to nonmovant, no issue of material fact and case can be decided as matter of law), *aff'd on other grounds,* 562 F.2d 297 (4th Cir. 1977)).

Rule 12(c) states that if matters outside the pleadings "are presented to and not excluded by the court," the court must treat the motion as one for summary judgment and must provide all parties "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Id.* In such an instance, the court is required to give all parties "reasonable opportunity to present all material made pertinent to such motion by Rule 56." Fed.R.Civ.P. 12(b); *see also Plante v. Shivar,* 540 F.2d 1233, 1235 (4th Cir.1976). According to the Fourth Circuit, " 'reasonable opportunity' includes 'some indication by the court to "all parties" that it is treating the 12(b)(6) motion as a motion for summary judgment,' with the consequent right in the opposing party to file counter affidavits or to pursue reasonable discovery." *Plante,* 540 F.2d at 1235 (quoting *Johnson v. RAC Corp.,* 491 F.2d 510, 513 (4th Cir.1974)).

Where a pleading is captioned alternatively as a summary judgment motion, the Court need not advise the parties of its intent to treat the motion as one for summary judgment, because it "does not have an obligation to notify parties of the obvious." *Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253, 260 (4th Cir.1998). Once on notice, an attorney has the responsibility, if he or she believes further discovery is necessary to adequately oppose summary judgment, to make a motion under Rule 56(f). *Id.*

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*

v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing summary judgment may not rest upon mere allegations or denials; a "mere scintilla" of evidence is insufficient to overcome summary judgment. Anderson, 477 U.S. at 248–52, 106 S.Ct. 2505. A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the nonmoving party. See id. at 255, 106 S.Ct. 2505. Unsupported speculation may not withstand a motion for summary judgment. See Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411–12 (4th Cir.1986). Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. 2548 (1986). When a motion for summary judgment is made, the evidence presented must always be construed in the light most favorable to the nonmoving party. See Smith v. Va. Commonwealth Univ., 84 F.3d 672, 675 (4th Cir.1996)(en banc).

## III. Analysis

The Defendant advances four arguments in support of summary judgment: (1) VI's claims are committed to the sole jurisdiction of the Virginia Alcoholic Beverage Control Board under the BFA; (2) VI should have known of the supposed falsity of the freshness policy in 1999 and early 2000 and accordingly their claims are time barred; (3) VI's claims arise out of contractual obligations and the misrepresentations it relied upon were mere expressions of opinion; (4) VI's claims are impermissible collateral attacks on the administrative proceedings. The Court will address Kirin's first two arguments only, because it finds that the statute of limitation argument is dispositive.

### A. Preemptive Effects of the Virginia Beer Franchise Act

■ Defendant contends that the Beer Franchise Act ("BFA") Va.Code Ann. § 4.1–500 et seq., precludes this action. The argument is that the BFA commits the resolution of complaints arising out of a commercial relationship between a beer wholesaler and a brewery to the sole jurisdiction of the ABCB. The issue before the Court is whether a beer distributor may maintain an action for fraud in the termination of an agreement, as defined in the BFA. The Court holds that the BFA does not preempt a cause of action for fraud, because the statute does not explicitly or necessarily preempt the common law.

■ As a federal court sitting in diversity, the Court is obliged to interpret and apply the substantive law of each state, see Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and must offer our best judgment about what we believe those courts would do if faced these arguments. See Hatfield v. Palles, 537 F.2d 1245, 1248 (4th Cir.1976) (noting that when "[t]here have been no decisions by the South Carolina Supreme Court ... [a] federal court must ... endeavor to decide the issue in the way it believes the South Carolina Supreme Court would decide it."). Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 512 (4th Cir. 1999). Since no Virginia court has addressed the issue of the preemptive effect of the BFA on the common law of fraud, the Court must determine how the Virginia Supreme Court would decide the issue.

It is undisputed that these parties had an "agreement" as defined by the BFA.

Kirin is "brewery" and VI is a "beer wholesaler" or "beer distributor" under the act. The act provides that no changes can be made unilaterally to any agreement. Va.Code. Ann. 4.1–505. These include cancellations, terminations, or refusals to renew. *Id.* To make such a change, a brewery must follow a detailed notice procedure and, if challenged, provide proof of good cause for any change. Va.Code Ann. § 4.1–506. If a brewery breaches its agreement with a wholesaler, it is subject to remedies imposed by law under 4.1–508 of the BFA, which may include payment of monetary damages after a hearing and judicial review. Finally, the act requires the parties to act in good faith, Va.Code Ann. § 4.1–517(A), subject to oversight by the ABCB. The BFA imposes a requirement of reasonableness on the terms and provisions of all wholesaler agreements. Va.Code Ann. § 4.1–517(B).

 Under Virginia law, the common law of England continues in full force and is the rule of decision, except as altered by the General Assembly. *Williams v. Matthews*, 248 Va. 277, 448 S.E.2d 625, 629 (1994). The common law will not be considered as altered or changed by statute unless legislative intent is plainly manifested. *Id.; Boyd v. Commonwealth*, 236 Va. 346, 374 S.E.2d 301, 302 (1988); *Hyman v. Glover*, 232 Va. 140, 348 S.E.2d 269, 271 (1986). A statutory change in the common law is limited to that which is expressly stated or necessarily implied because the presumption is that no other or additional change was intended. *Boyd*, 374 S.E.2d at 302. Therefore, "[w]hen an enactment does not encompass the entire subject covered by the common law, it abrogates the common-law rule only to the extent that its terms are directly and irreconcilably opposed to the rule." *Mitchem v. Counts*, 259 Va. 179, 523 S.E.2d 246, 250 (2000). Statutes in derogation of the common law are to be strictly construed and not to be enlarged in their operation by construction beyond their express terms. *Jan Paul Fruiterman, M.D. & Assocs., P.C. v. Waziri*, 259 Va. 540, 525 S.E.2d 552, 554 (2000).

Applying these principles of strict construction, the Court holds that the BFA does not preempt common law fraud claims between breweries and wholesalers. Kirin's argument rests upon the premise that VI has "recast . . . statutory contract claims as common-law fraud claims. . . ." (Def. Mem. at 8.) However, the procedural posture of this case prevents the Court from drawing such an inference in favor of Kirin. Statutory derogation of the common law must be "expressly stated or necessarily implied." *Boyd*, 374 S.E.2d at 302. The BFA does not explicitly state that it preempts the common law. However, the statutory scheme necessarily implies an alteration of the freedom of contract. For instance, the BFA's definition of an "agreement" cannot be reconciled with the Statute of Frauds. Unlike the freedom of contract, the statute does not necessarily preempt the common law of fraud. A plaintiff could state a cause of action for fraud completely without reference to its obligation or relationship under the BFA. Without accepting Kirin's premise that VI's claims are mere contract claims dressed up as fraud claims, the Court cannot hold that the BFA necessarily preempts a cause of action for fraud.

Kirin provides no statutory or case citations for the proposition that causes of actions for fraud are preempted by the BFA. Kirin argues that in similar instances courts have ruled that contract disputes, such as the one present here, are committed solely to the jurisdiction of the administrative agency. *See, e.g., Palumbo v. Waste Tech. Ind.*, 989 F.2d 156 (4th Cir.1993)(holding a federal court has no jurisdiction to hear a collateral attack on state decisions committed to the exclusive jurisdiction of state environmental protec-

tion agency and environmental authorities); *Seatrain Lines, Inc. v. Gloria Mf'g Corp.*, 222 Va. 279, 279 S.E.2d 166, 167 (1981) (holding that court would defer to the Federal Maritime Commission, which has jurisdiction over issues of classification of cargo pursuant to tariffs, in order to ensure uniformity and consistency in the regulation of business entrusted to the agency). In *AT & T Communications of Virginia, Inc. v. Bell Atlantic–Virginia, Inc.*, 35 F.Supp.2d 493 (E.D.Va.1999)(Brinkema, J.), the court recognized that the FCC regulation of interstate toll dialing agreements requires courts to defer to the administrative agency rather than to entertain private civil suits over such agreements.

The cases cited by Kirin are inapposite. The Fourth Circuit's decision in *Palumbo* is factually distinguishable. In that case, the plaintiff sought a review of a permit decision made by the federal Environmental Protection Agency. 989 F.2d at 159; *see DMJ Assoc. v. Capasso*, 228 F.Supp.2d 223, 230 (E.D.N.Y.2002). However, the Resource Conservation and Recovery Act expressly prohibited such a collateral attack. *Palumbo*, 989 F.2d at 159 ("Action of the Administrator with respect to which review could have been obtained under this subsection *shall not be subject to judicial review* in civil or criminal proceedings for enforcement.")(emphasis added). In

the instant case, the BFA does not contain comparable language forbidding VI's common law fraud claim.

▬ The other two cases relied upon by Kirin are legally distinguishable. Both *Seatrain* and *AT & T Communications* involved the doctrine of primary jurisdiction. Under this doctrine, claims "properly cognizable in court that contain some issue within the special competence of an administrative agency should be dismissed pending the outcome of the agency's adjudication." *AT & T Communications*, 35 F.Supp.2d 493, 497–98 (E.D.Va.1999) (citing *Reiter v. Cooper*, 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993)). The primary jurisdiction doctrine is concerned with protecting the administrative process from judicial interference. *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1265 (11th Cir.2000). Primary jurisdiction does not apply. Both cases involved a federal court deferring to the expertise of a federal agency.[1] Neither case deals with or discusses the effect of a state regulatory scheme on state common law claims. Therefore, the Court holds that primary jurisdiction does not apply to the instant case.

Since the BFA does not explicitly or necessarily preempt the common law, the Court will hold that the BFA does not preempt common law fraud claims between a brewery and its distributor.[2]

1. Assuming that primary jurisdiction did apply, under the principles established by *Erie*, Federal courts will defer to the primary jurisdiction of a state agency, if state courts would defer. *Kendra Oil & Gas, Inc. v. Homco, Ltd.* 879 F.2d 240, 242 (7th Cir.1989). A Virginia court would defer to the BFA only if the statute preempted the common law fraud claim. Therefore, the question of whether this Court should defer to the ABCB collapses into the inquiry of whether the BFA preempted the common law. Furthermore, primary jurisdiction does not extend to a legal question that is within the conventional competence of the courts when the Court will not

need the agencies technical or policy expertise. *Id.* (citing *National Communications Ass'n v. AT & T Co.*, 46 F.3d 220, 223 (2d Cir.1995)). The question of whether the BFA preempted the common law of fraud in Virginia is a question of statutory interpretation and well within the competence of this Court.

2. The Court also notes that under Virginia law, a plaintiff must "provide proof of an independent, wilful tort, beyond the mere breach of a duty imposed by contract." *JPS Elastomerics Corp. v. Indus. Tools Inc.*, 65 F.Supp.2d 376 (W.D.Va.1998); *Foreign Mission Bd. v. Wade*, 242 Va. 234, 409 S.E.2d

### B. Statute of Limitations

The second argument advanced by the Defendant is whether under Virginia law, VI's fraud and constructive fraud claims are untimely. The issue before the Court is whether VI could have discovered the alleged misrepresentations prior to June 2000. The Court holds that VI was on notice prior to June 2000 of Kirin's alleged fraud or could have learned of it through the exercise of due diligence. Therefore, VI's cause of action is untimely.

VI commenced this action on June 5, 2002. It concedes that the alleged misrepresentations were made in April 1999, more than 3 years earlier, and that it did not discover that the opinions were false until the "discovery and hearing process in the formal ABC proceedings in July and October 2000." (Compl.¶ 33.) VI argues that Kirin's fraud did not become clear until between July 5, 2000 and December 14, 2000 and then again on September 26, 2001 when the "ABC issued its shocking final decision." (Pl. Mem. at 16.) VI claims that it was not until September 2000, 181 days after Kirin's appointment of new distributors, that it could have learned that the freshness policy was fraudulent. The Court disagrees.

■ State law governs the existence and interpretation of any statute of limitation in a federal diversity action. *Conner v. St. Luke's Hosp. Inc.,* 996 F.2d 651, 653–55 (4th Cir.1993). Virginia law sets a two-year limitations period for claims of fraud and constructive fraud. Va.Code Ann. § 8.01–243 ("every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues.") Furthermore, Va.Code Ann.

§ 8.01–249 provides that a cause of action shall be deemed to accrue "[i]n actions for fraud ... when such fraud ... is discovered or by the exercise of due diligence reasonably should have been discovered." *STB Marketing Corp. v. Zolfaghari,* 240 Va. 140, 393 S.E.2d 394, 397 (1990). A plaintiff bears the burden "to prove that he acted with due diligence and yet did not discover the fraud or mistake until within the statutory period of limitation immediately preceding the commencement of the action." *Hughes v. Foley,* 203 Va. 904, 128 S.E.2d 261, 263 (1962). To comply with the requirement of due diligence, as used in Code § 8.01–249, a plaintiff must use "[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent [person] under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case." *Id.*

Generally, VI claims that Kirin fraudulently misrepresented that it had a freshness policy in order to produce a reason to terminate VI's franchise. Specifically, VI claims that the following statements were fraudulent: (1) Kirin's representations to VI and ABC Hearing Panel that "out-of-date" beer posed a "public health hazard" (Compl.¶ 30); (2) Kirin's representations that "Zero Tolerance" for non-compliance with the Freshness Policy was necessary and commercially practicable (*id.* ¶ 31); (3) Kirin's false allegations that VI had subjected the public to a serious health hazard (*id.* ¶ 32).

■ Whether a plaintiff exercised "due diligence" may be determined at the summary judgment stage of the proceedings.

144, 148 (1991)("the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract"). The Court does not reach the issue of whether to maintain a cause of action for fraud under Virginia Law,

a Plaintiff must show the breach of a duty independent of the BFA. The Court, however, is skeptical of whether VI could meet such a test, given that at oral argument counsel for VI conceded that reinstatement of the ABCB's decision would moot VI's damages.

*See, e.g., Hansen v. Stanley Martin Co.,* 266 Va. 345, 585 S.E.2d 567, 574 (2003). Defendants are place on inquiry notice by "evidence of the possibility of fraud, not by complete exposure of the alleged scam." *Jones v. Saxon Mortgage, Inc.,* 980 F.Supp. 842, 847 (E.D.Va.1997).

 Prior to June 2000, the circumstances surrounding Kirin's invocation of the "freshness policy" provided VI evidence of the possibility of fraud. VI was on notice that Kirin's invocation of its "freshness policy" was pretextual. First, Kirin announced its strategic relationship with another distributor: Anheuser–Busch. *See Financial Digest,* Wash. Post, June 6, 1996, at D9; *but see Hansen,* 585 S.E.2d at 574–75 (holding Washington Post article alone is insufficient to place plaintiff on notice of fraud). Next, Kirin attempted to buy out VI from its agreement. (Compl.¶ 10.) Within a month of VI's rejection of Kirin's offer, Kirin sent a letter to VI stating that it had a freshness policy—even though Kirin had never invoked such a policy in the past—and gave VI fewer than eight days to bring over 100 different accounts into compliance with that policy.[3] (Compl.¶ 15.) Kirin initiated the termination proceedings, before the close of the 120–day period the parties had agreed upon. (Compl.18.) Although Kirin's alleged scheme, at the time when it began the termination proceedings, was not complete, VI had sufficient evidence to be placed on notice of the possibility of fraud.

The administrative proceedings that occurred before June 2000 provided VI with more evidence that Kirin's actions could have been fraudulent and triggered its requirement to perform due diligence. On October 4, 1999, VI sent a "Cure Letter" to Kirin, stating that it was in compliance with the Freshness policy. (Compl.Ex. 1.) On October 22, 1999, Kirin replied, denying that VI was in compliance. In that letter, Kirin demanded a formal hearing before the board. On February, 9, 2000, the ABC Secretary issued a letter to Kirin announcing that Kirin could replace VI with a new distributor. (Compl.¶ 22.)

VI's fraud claim centers around Kirin's invocation of its "freshness policy." VI further contends that it could not have determined that out-of-code beer was not a "public health hazard" until Hiroki Asakura, a "high-ranking Kirin official," admitted in deposition that the "public health hazard" was nothing more than Kirin customers "drinking a product different than what they expected." (Pl. Mem. at 17.) Asakura admitted at the October 2000 ABC proceeding that Kirin beer in Japan is considered fresh for 270 days after bottling. (*Id.* at 18.) However, this argument conflicts with VI's statements that *for 20 years* Kirin had no freshness policy and VI had distributed out-of-code beer. Twenty years of experience of distributing beer aged more than 180 days, should have indicated to VI that old beer did not pose public health hazard.[4]

---

3. The Court agrees with VI: "Just as a tiger does not change its stripes, an outstanding wholesaler does not become a wholly deficient wholesaler overnight. Kirin terminated Virginia Imports because Virginia Imports refused to be bought out." (Def. Mem. Ex. C at 31 (VI's Brief to the ABCB).) Kirin's about face should have signaled to VI that its business partner may not have been acting in good faith.

4. In preparation for the proceedings in front of the ABCB, VI employed an expert witness, Seymore Leikind, with 43 years of experience in the beer industry. (Def. Mem. Ex. C at 39.) Mr. Leikind stated that "[i]n all my experience in the industry, I have not heard of people becoming ill when they consumed out-of-code beer." (*Id.*) Clearly, VI could have contacted an expert, such as Mr. Leikind, when Kirin first announced the potential for a public health hazard.

Furthermore, VI should have known that Kirin's "zero-tolerance" policy was pretextual. VI's own experience belied the "zero tolerance" freshness policy. As VI stated in its brief to the ABCB, "the Kirin personnel are experience in the beer business. Surely they know *what everyone else knows:* There is no such thing as an achievable zero tolerance freshness policy." (Def. Mem. Ex. C at 31 (emphasis added).) VI should have know what "everyone else" knew that Kirin may have been invoking the freshness policy as a pretextual reason to terminate their relationship. Kirin's invocation of a unachievably high standard triggered VI's requirement to perform due diligence to determine if the policy was pretextual.

In considering the timeliness of VI's action, the Court finds the *Jones* case particularly instructive. 980 F.Supp. 842. In *Jones,* the plaintiff entered into a contract to refinance his home, but received less of the loan proceeds than his broker had lead him to believe he would. *Id.* at 843–44. In financial trouble, the plaintiff defaulted on the loan, and the defendant instituted foreclosure proceedings. *Id.* at 844. After receiving the notice of foreclosure, the plaintiff filed a pro se action in the Circuit Court for Fairfax County, on December 6, 1993. *Id.* The plaintiff subsequently non-suited the pro se action on February 10, 1995, *id.,* and filed a suit in the federal court for the Eastern District of Virginia six months later. The federal district court held that the plaintiff's suit was untimely, because the plaintiff's filing of the state court suit, reflected that "at the time the loan was consummated, it was apparent to Jones the Broker was either dishonest, inept, or both." *Id.* at 847.

The termination by Kirin and the appointment of AB, like the foreclosure in *Jones,* triggered VI's responsibility to perform due diligence to determine if Kirin was in compliance with the requirements of acting in good faith under the BFA or whether Kirin was acting fraudulently. *See Jones,* 980 F.Supp. at 844. Like the plaintiff in *Jones,* VI took matters into its own hands and instituted proceedings to challenge Kirin's actions. In February, VI, itself, filed a "formal protest of the termination with the ABC Board, requesting a hearing on whether Kirin had complied with the Franchise Act on whether Kirin had complied with the Franchise Act in effecting the termination." Like the *Jones* plaintiff's filing of a complaint in Virginia state court, VI's request for a hearing shows that VI knew that Kirin may not have been acting in good faith. The BFA requires proof of good cause for the termination of any agreement between a brewery and a distributor. By opposing the termination, VI acknowledged that Kirin did not have "good cause" to terminate the franchise. Kirin's appointment of AB as its distributor and VI's filing of a formal protest in February of 2000, at latest, put VI on notice of the possibility of fraud.

## IV. Conclusion

Since VI's claims are untimely, the Court will not address Kirin's other arguments for summary judgment. For the foregoing reasons, Kirin's Motion for Summary Judgment will be granted.